COPY RECEIVED
LAW OFFICE

FEB 0 4 2010

JIM DENTON

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

CENTURION PROPERTIES III, LLC SMI
GROUP XIV, LLC,

               Plaintiffs,

             v.

TOM HAZELRIGG III; AARON
HAZZELRIGG, ,

               Defendants.

NO. *10 - 02 - 00301 - 8*

**SUMMONS**

**THE STATE OF WASHINGTON,  AND :.**

    **TO THE DEFENDANTS:** A lawsuit has been started against you in the above-entitled court by plaintiff(s). Centurion Properties III, LLC and SMI Group XIV, LLC.  Plaintiff(s)' claim is stated in the written complaint, a copy of which is served upon you with this summons.

    In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and by serving a copy upon the person signing this summons within 20 days after the service of this summons, (or 60 days if you are served outside of the State of Washington), excluding the day of service, or a default judgment may be entered against you without notice.  A

SUMMONS- 1



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON  98122
(206) 325-6092
FAX (206) 325-1424

default judgment is one where plaintiff(s) are entitled to what has been asked for because you have not responded. If you serve a notice of appearance on the undersigned person, you are entitled to notice before a default judgment may be entered. A copy of your answer and all other responsive pleadings must be filed with the court.

You may demand that the plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

**THIS SUMMONS** is issued pursuant to Rule 4 of the Superior Court Civil Rules of the State of Washington.

DATED this 2nd day of February, 2010.

_____
David A. Leen                    WSBA #3516
Attorney for Plaintiffs

SUMMONS- 2

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

COPY RECEIVED
LAW OFFICE

FEB 0 4 2010

JIM DENTON

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

CENTURION PROPERTIES III, LLC; SMI
GROUP XIV, LLC,

           Plaintiffs,

v.

TOM HAZELRIGG III; AARON
HAZZELRIGG; PATRICK McCOURT;
BARCLAY'S NORTH, INC; NICOLE
KELLY; DANIEL A KIRBY; Trustee – JIM
DENTON; EQUITY FUNDING, LLC;
CENTRUM FINANCIAL; TRIDENT
INVESTMENTS; EVERGREEN BANK;
and JOHN DOES 1-10,

           Defendants.

NO. 10 - 2 - 00301 - 8

**COMPLAINT**

1. Injunctive Relief
2. Civil Conspiracy
3. Ricco (State)
4. Breach of Fiduciary Duty
5. Quiet Title
6. Corporate Misconduct –
   Forfeiture of Interest
7. Deceptive Practices – RCW
   19.86
8. Conversion
9. Reallocation of member's
   interest
10. Attorney Fees and Costs

**COMES NOW** plaintiff, by and through their attorneys, Leen & O'Sullivan, and brings this

cause of action against the defendants named herein alleging as follows:

COMPLAINT- 1



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

## I. PARTIES

1.1 <u>Centurion Properties III, LLC</u> (hereinafter "CP3") owns and manages the leasehold interests associated with the Battelle Memorial Institute Campus, located in Kennewick, Benton County, WA. The property consists of five buildings and encompasses about 340,000 square feet, mainly class A office space, used by Battelle. This is hereinafter referred to as "the Battelle property" The property has a senior acquisition loan from General Electric Capital (hereinafter "GE") with a present balance of approximately $58,000,000 due, and has been declared to be in default, primarily because of the illegal actions and inactions of defendants by fraudulently over-encumbering the property which has made it impossible to obtain permanent financing. The property generates approximately $550,000 in monthly rents which has adequately covered the management fees and legitimate debt service on the GE loan that is secured by a deed of trust.

1.2 <u>SMI Group XIV, LLC</u> is the manager of Centurion Properties III, LLC., the owners of the lease hold interests.

1.3 Defendant Tom Hazelrigg III is believed to be a resident of King County Washington and, from time to time, acts as or claims to be an owner of the property. Whatever interest he may have in the property, it is vested in fictitious names or other family members or confederates .

1.4 Patrick McCourt is holding an interest in the Battelle property for the benefit of Tom Hazelrigg III.

COMPLAINT- 2



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6092
FAX (206) 325-1494

1.5  Patrick McCourt is the nominal president of Barclay's North, LLC  and is  believed to be an alter ego of Tom Hazelrigg and claims an interest in the property;

1.6  Nicole Kelly is Tom Hazelrigg's daughter and claims an interest in the property;

1.7  Daniel A. Kirby is claiming an ownership interest as well as a right to tax benefits associated with the property and defendants are attempting to transfer an interest to Kirby without paying excise tax and with intent to defraud the Internal Revenue Department; by shifting tax credits to Kirby to pay personal debts of Hazelrigg.

1.8  Jim Denton is a licensed attorney and practices in Seattle, Wa.  He is acting as Trustee under certain deeds of trust placed illegally upon the property by defendant Tom Hazelrigg III. Denton is threatening to sell the subject property at a non judicial sale on February 26, 2010. Denton is a defendant only in his capacity of Trustee.

1.9  Equity Funding, LLC is claiming a legal and/or beneficial interest in five deeds of trust and other liens that defendant Hazelrigg illegally  placed upon the property and is working in concert with Hazelrigg  and Denton to strip the equity of the subject property.

1.10  Centrum Financial Services, Inc., is the managing entity of Equity Funding, LLC., and claims an interest in the property.

1.11  Trident Investments , Inc., is a related entity of Equity Funding and also claims an interest in at least one of the deed of trust and/or illegal liens on  the Battelle property.

COMPLAINT- 3

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

- 1.12  Evergreen Bank, recently taken over by Umpqua Bank, claims an interest in the subject property.

## II. PROPERTY DESCRIPTION/LEASES

Lease dated November 16, 1993 and Notice of Lease recorded on March 18, 1994 under Benton County Recording No. 94-9708, between Battelle Memorial Institute, an Ohio corporation, as Lessor, and Sigma Financial Group IX L.P., a Washington Limited Partnership (as to Parcel A) and as assigned to Centurion Properties III, LLC, a Washington Limited Liability Company, said Assignment dated November 28, 2006, and recorded on November 29, 2006, under Benton County Recording No. 2006-039333;

Lease dated June 22, 1992 and Notice of Lease recorded on October 8, 1992 under Benton County Recording No. 92-25097 between Battelle Memorial Institute, an Ohio corporation, as Lessor, and Sigma Financial Group VIII L.P., a Washington Limited Partnership (as to Parcel B) and as assigned to Centurion Properties III, LLC, a Washington Limited Liability Company, said Assignment dated November 28, 2006, and recorded on November 29, 2006, under Benton County Recording No. 2006-039332;

Lease dated July 23, 2002 and Memorandum of Ground Lease recorded on July 31, 2002 under Benton County Recording No. 2002-029626 between Battelle Memorial Institute, an Ohio non-profit corporation, as Lessor, and Sigma Financial Group X L.P., a Washington Limited Partnership (as to Parcel C) and as assigned to Centurion Properties III, LLC, a Washington Limited Liability Company, said Assignment dated November 28, 2006, and recorded on November 29, 2006, under Benton County Recording No. 2006-039334;

Lease dated June 15, 1990 and Notice of Leases recorded on September 20, 1990 under Benton County Recording No. 90-15933 between Battelle Memorial Institute, an Ohio corporation, as Lessor, and Sigma Financial Group VI L.P., a Washington Limited Partnership (as to Parcel D) and as assigned to Centurion Properties III, LLC, a Washington Limited Liability Company, said Assignment dated November 28, 2006, and recorded on November 29, 2006, under Benton County Recording No. 2006-039330;

Lease dated January 31, 1991 and Notice of Leases recorded on July 26, 2006 under Benton County Recording No. 2006-024100 between Battelle Memorial Institute, an Ohio corporation, as Lessor, and Sigma Financial Group VII L.P., a Washington Limited Partnership (as to Parcel E) and as assigned to Centurion Properties III, LLC, a Washington Limited Liability Company, said Assignment dated November 28, 2006,

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(906) 395-6092
FAX (906) 395-1494

and recorded on November 29, 2006, under Benton County Recording No. 2006-039331;

Said Ground Lease and together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, located in Benton County, State of Washington (the "Real Property"):

PARCEL A:

A parcel of land situated in the Southwest quarter of Section 14, Township 10 North, Range 28 East, W.M., Benton County, Washington, described as follows:

Commencing at the Southeast corner of said Southwest quarter;
thence North 01°45'22" West along the Easterly line of said Southwest quarter a distance of 1,114.78 feet;
thence South 89°22'24" West a distance of 33.60 feet to the Westerly right-of-way of George Washington Way and the true point of beginning;
thence South 01°47'14" East along said Westerly right-of-way a distance of 514.00 feet;
thence South 89°22'24" West a distance of 878.08 feet;
thence North 00°55'00" West a distance 513.90 feet;
thence North 89°22'24" East a distance of 870.28 feet to the true point of beginning.

PARCEL B:

A parcel of land situated in the Southwest quarter of Section 14, Township 10 North, Range 28 East, W.M., Benton County, Washington, described as follows:

Commencing at the Southeast corner of said Southwest quarter;
thence North 01°45'22" West along the Easterly line of said Southwest quarter a distance of 1,628.77 feet;
thence South 89°22'24" West, a distance of 33.88 feet to the Westerly right-of-way of George Washington Way and the true point of beginning;
thence South 01°47'14" East along said Westerly right-of-way, a distance of 514.00 feet;
thence South 89°22'24" West, a distance of 870.28 feet;
thence North 00°55'00" West, a distance of 513.90 feet;
thence North 89°22'24" East, a distance of 862.46 feet to the true point of beginning.

PARCEL C:

Lot 2, as delineated on Short Plat No. 2561, recorded under Auditor's Recording No. 2001-008018, records of Benton County, Washington, TOGETHER WITH access to city street known as "Q" Avenue, as disclosed in instrument recorded February 7, 1995, under Recording No. 1995-002801.

COMPLAINT- 5



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

**PARCEL D:**

A parcel of land situated in the Southwest quarter of Section 14, Township 10 North, Range 28 East, W.M., Benton County, Washington, described as follows:

Commencing at the Southeast corner of said Southwest quarter;
thence North 01°45'22" West along the Easterly line of said Southwest quarter a distance of 2,107.60 feet;
thence South 89°22'24" West a distance of 34.14 feet to the Westerly right-of-way of George Washington Way and the true point of beginning;
thence continuing South 89°22'24" West a distance of 855.19 feet;
thence North 00°55'00" West a distance of 488.61 feet to the Southerly right-of-way of Horn Rapids Road;
thence North 89°22'24" East along said right-of-way a distance of 462.15 feet to a point of curve;
thence along a curve to the right having a central angle of 88°50'22", a radius of 393.50 feet, and an arc length of 610.14 feet to a point of tangent common to the Westerly right-of-way of said George Washington Way;
thence South 01°47'14" East along said Westerly right-of-way a distance of 103.10 feet to the true point of beginning.

**PARCEL E:**

A parcel of land situated in the Southwest quarter of Section 14, Township 10 North, Range 28 East, W.M., Benton County, Washington, described as follows:

Commencing at the Southeast corner of said Southwest quarter;
thence North 01°45'22" West, along the Easterly line of said Southwest quarter a distance of 1,628.77 feet;
thence South 89°22'24" West a distance of 33.88 feet to the Westerly right-of-way of George Washington Way and the true point of beginning;
thence continuing South 89°22'24" West a distance of 862.46 feet;
thence North 00°55'00" West a distance of 478.74 feet;
thence North 89°22'24" East, a distance of 855.19 feet to said Westerly right-of-way;
thence South 01°47'14" East along said Westerly right-of-way a distance of 478.83 feet to the true point of beginning.

## III. FACTS

### Background

3.1    Mike Henry and his wife are life-long residents of the Tri-Cities, and a product of their schools and Washington State colleges.

3.2    Henry has been a business owner and property manager in the Tri-Cities area for approximately 20 years. He owns eight different companies specializing in commercial real estate

COMPLAINT- 6



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

property, construction and property maintenance, including Sigma Management, Inc., a Washington corporation ("Sigma") which is a property management company. Collectively, his businesses currently employ approximately 20 people in the Tri-Cities area.

3.3     He is the president Sigma. He is also the sole member of SMI Group XIV, L.L.C., a Washington limited liability company ("SMI"). SMI presently owns a 25% membership interest in Centurion Properties III, LLC, a Washington limited liability company ("CP3") and, since September 25, 2009 SMI has been the sole managing member of CP3.

### The Subject Property

3.4     The property which is the subject of this action is a portion of the property known locally as the Battelle Memorial Institute Campus and is located at 3200 – 3350 Q Ave., 620 Battelle Blvd., Richland, WA. The subject property (the "Battelle Property") consists of five buildings, related improvements and common areas located on the Battelle campus, which is part of the Pacific Northwest National Laboratory.

The buildings were constructed between 1990 and 2002 to Battelle's specifications. The construction of the buildings was originally bid out and awarded to Sigma as the developer. Sigma was the project manager during construction and has served continuously since then as the property manager. Four of the buildings (which comprise 90% of the Property) are used as Class A office space and computer-server/data centers. The fifth building is an 84-bed facility for residential housing, used by the tenant to accommodate both short and long term stay on the campus. The total buildings comprising the Property encompass approximately 340,000 square feet. The Property is currently used daily by approximately 1,200 Battelle staff and visitors.    Initially Henry was employed by the owners of Sigma, handling the construction and managing the Property. In 2002, Henry purchased Sigma from its owners, and has been its president ever since.    Prior to then, Sigma



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

had been owned by R.J. and Diane Hoch, who also owned the Original Ground Tenant (as that term is defined below).

      3.5    The land under the five buildings is actually still owned by Battelle.    Battelle originally ground leased that land to Sigma Financial Group entities. (the "<u>Original Ground Tenant</u>") under five separate, long term ground leases (the "<u>Ground Leases</u>").  The Original Ground Tenant owned the buildings and related improvements located on the land, even though it did not own the land. After completion of the buildings and improvements, the Original Ground Tenant leased those buildings and improvements back to Battelle through five separate shorter term facilities leases (the "<u>Facilities Leases</u>").  Accordingly, Battelle is both the ground landlord and the facilities tenant for each of the five buildings.  Under the Ground Leases, the ground tenant pays Battelle ground rent. Under the Facilities Leases, Battelle pays its landlord (i.e. the ground tenant) a base rent amount, and also "<u>service rent</u>" which includes all actual, documented and approved expenses incurred in connection with each portion of the Property (<u>e.g.</u> property management fees, maintenance, etc...).

### CP3 Formation & Acquisition

      3.6    In 2006, the Original Ground Tenant decided to market its interests in the Property and, subsequently, Henry's company SMI Group XI, LLC entered into an agreements to purchase all of the Original Ground Tenant's interests in the Property from the Original Ground Tenant, <u>i.e.</u> all of its (a) leasehold interest as ground tenant under the Ground Leases,  (b) interest as facilities landlord under the Facilities Leases, and (c) interest as the owner of the buildings and improvements located on the land (collectively (a)-(c) is referred to as the "<u>Subject Property</u>" and excludes the underlying ground - which remains owned by Battelle).   There was at least one other entity interested in purchasing the Subject Property, and if Henry was unable to close on the purchase in a timely manner, the sellers warned Henry they would sell to the other entity.  Henry was also told the other potential purchaser was willing to pay more and, more importantly, had its own property



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

management affiliate.  Although Sigma had a long-term property management contract for the Subject Property, it could be terminated by a new owner.  Thus closing on the purchase meant not only acquiring the Subject Property, but assuring the continuation of Sigma's contract.

3.7    To close on the purchase, Henry began working with General Electric Capital Corporation ("GE") as a possible lender.  Henry already had a business relationship with GE, as he had recently closed on another deal with them as lender. For this deal, GE required a line up of additional investors before GE would commit to making the acquisition loan.  Henry started looking for other business people with substantial credit and funds to satisfy GE's criteria.  In August 2006, Henry was introduced to and met with Thomas R. Hazelrigg III ("Hazelrigg").  During that meeting Hazelrigg expressed interest in investing in the project and informed Henry that he had substantial financial wherewithal, which would be sufficient to meet GE's requirements and allow CP3 to close on the purchase agreement.    GE approved Hazelrigg as an investor, which was consistent with Henry's impression that Hazelrigg was a savvy businessman with substantial wealth and good credit. CP3 was ultimately able to close on the purchase in November, 2006 for $74.5 million, with a 10% down payment and using a three year bridge financing loan from GE for the balance, and certain limited personal guarantees for $5 million in aggregate.

3.8    The purchasing entity was originally going to be a single-purpose limited liability company: CP3. CP3 was going to be 90% owned by Hazelrigg and 10% by Henry's company SMI. Henry was to contribute the purchase agreement, information on the property, long relationship with the tenant and relationship with GE; Hazelrigg was going to pay the 10% down payment, with the understanding that he would get a preferred return out of the cash flow until he was repaid the entire down payment.  In addition, Hazelrigg would provide the limited loan guaranty, although SMI would be pro-rata liable to reimburse Hazelrigg any amount he paid under the loan guaranty. Otherwise, all cash flow and proceeds would be split 90/10. Initially Henry asked for a 25% interest, given the value he thought he brought to CP3, but after numerous discussions with Hazelrigg, he

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

indicated he had numerous other properties that he would be looking to partner with on the same 90/10 split and Sigma would get management contracts out of these other properties throughout the country. Accordingly, considering future business opportunities for entering into this business relationship with him, Henry agreed to the 90/10 split rather than the 75/25.

3.9     The final documentation for CP3 did not match Henry's discussions with Hazelrigg, but by the time Henry received the documentation to review and approve, he had no choice to accept his arrangement or walk away and lose Sigma's management contract, as his exclusive right to purchase the Subject Property was going to expire and he had no other investors lined up who could satisfy GE's requirements.    In the end, Hazelrigg decided to have his children and close friend take the 90% interest, have one of his children act as CP3's manager and the final ownership structure and management of CP3 was as follows:

- 78% to Hazelrigg's son Aaron Hazelrigg ("Aaron"), through his company Centurion Management III, LLC, a Washington limited liability company ("Centurion") (at the time I was told Aaron was the sole owner of Centurion) - Centurion was also named CP3's sole manager;
- 10% to Hazelrigg's daughter Nicole Kelly individually,
- 1% to Hazelrigg's friend Patrick McCourt;
- 1% to Barclay's North, LLC (Patrick McCourt's company)
- 10% to SMI.

In addition, instead of a capital contribution by Hazelrigg or his designees with a preferred return, the $8,425,000 cash down payment and $5,000,000 cash collateral deposit with GE were booked as unsecured loans from Hazelrigg companies known as Centurion Southwest, LLC and Centurion Pacific, LLC to CP3, which accrued interest at 15% and had to be paid in full from the company's proceeds, after servicing the GE loan, and before distributions to the members.    The result was the same - a preferred return for Hazelrigg until his down payment with interest (aka his unsecured loans) had been repaid.    Aaron, Patrick McCourt and Barclay's North were also required

COMPLAINT- 10



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

to give GE a limited loan guaranty for $5 million, although CP3's operating agreement does provide for pro-rata reimbursement by the other members if they are forced to pay on the guaranty.

3.10    The final GE loan terms also ended up being different than Henry had been led to expect.  Instead of a long term loan, GE only agreed to a 3-year bridge loan; although they orally informed Henry that if he was able to get extensions on the Facilities Leases for at least another five years each, GE would replace the bridge loan with longer term financing.  Unfortunately, by the time he procured the extensions GE was no longer interested in providing a longer term loan, and the original loan matured November 30, 2009.  When CP3 was originally lining up the GE loan, Henry suggested CP3 solicit other lenders, but Hazelrigg instructed him that he did not want to do so. Although Henry's initial GE contact was Barbara Jabarra, Hazelrigg had developed a social relationship with Kyle Williams, who had been brought in by GE.   Hazelrigg told Henry that he wanted to go strictly with GE and Kyle Williams and, accordingly, there was no back up plan when GE informed CP3 of its decision to only provide a bridge loan.

### Additional Construction Funds and Shortfalls

3.11    During the course of obtaining financing for the overall project, Battelle, the tenant, requested a major renovation (construction project) in one of the facilities. CP3 procured a bid price of $3.366 million, and Battelle agreed it would pay that amount over time (aka "delta rent payments"), in addition to paying the regular rent and operating costs it was already paying under the Facilities Leases.   GE agreed to add the construction financing on top of the amount needed to purchase the Subject Property, which brought the total GE loan amount to just over $70.86 million. GE conditioned the release of this construction loan, however, on Henry obtaining a lease supplement indicating that Battelle had agreed to pay the full cost of construction.    The GE loan closed in November 2006, but the $3.366 million portion of its loan was held back until January 2007 - when Henry provided GE with the executed supplement to the Facilities Leases.



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE
WASHINGTON 98122
(206) 325-6092
FAX (206) 325-1424

3.12    Prior to closing Henry had no reason to doubt his initial impression that Hazelrigg was a wealthy, honest, and successful businessman. He was, however, quickly disabused of that impression. Problems started with the construction financing and payments almost immediately. First, Battelle paid the monthly "delta-rent" of $515,000 as a down payment amount for CP3 to begin the construction. Hazelrigg demanded Sigma, as the management company, pay him the entire $515,000. This surprised Henry because the GE loan documents required CP3 to use all Battelle's delta-rent payments to pay down the GE loan. Henry told Hazelrigg he could not give him the money because it would cause CP3 to default on the GE loan. Hazelrigg was adamant: he wanted that money. He told Henry he controlled the company, not Henry, and that he should not worry because he would send it back to CP3 to cover construction costs. Then, just a few days later (January 11, 2007) Hazelrigg withdrew $3.15 million which GE had loaned to CP3 to pay for the construction. Again Henry told him this was wrong, violated the GE loan documents and CP3 needed the money to fund construction. Again, Hazelrigg reminded Henry that he controlled CP3, and assured Henry he would return the money to make construction progress payments as they came due.    Henry was shocked by Hazelrigg's actions: both his looting a total of $3.65 million CP3 needed for construction and to pay back GE, and that he caused CP3 to immediately be in breach of its GE loan covenants, which Henry perceived as endangering the company and its assets.

3.13    When Henry questioned Hazelrigg's actions, he pointed out Hazelrigg did not control CP3 since he was not an owner or the manager; it was his children and friend who owned 90% of the company. Hazelrigg responded that the listed owners of the 90% were just "figure heads" and that he was running everything.    Hazelrigg's son Aaron confirmed that Hazelrigg called the shots, not Aaron and not Aaron's company. Moreover, Hazelrigg threatened to fire Sigma as the management company unless Henry gave him the money. Accordingly, to protect the Sigma contract, and since Henry did not have the ability under the CP3 operating agreement to control CP3's actions, he reluctantly allowed Hazelrigg to withdraw all the construction funds to Hazelrigg.



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

3.14    Hazelrigg periodically gave back money for CP3 to cover progress payments on the construction as they came due, but, it got increasingly harder to get Hazelrigg to pay back the money. With the balance of the project and three or four progress payments remaining, Hazelrigg stopped returning money all together. Hazelrigg told Henry he simply did not have any more money to send. Hazelrigg had taken approximately $3.96 million of CP3's money, but by then had only paid back approximately $2 million (i.e. $1.95million less than he took).

3.15    Because Hazelrigg took the money CP3 did not have the funds to pay for completion of construction, although Battelle was making their delta-rent payments CP3 was required to use the Battelle money to pay down the GE debt. Thus, Henry was forced to loan CP3 about $500,000 to complete construction, through Sigma and other sources. Because Henry was able to do this, CP3 went forward, paid the construction costs on time and completed the project.

3.16    About a year later, when Henry had successfully procured extensions of all five Facilities Leases, GE released $2.6 million of the $5 million (plus interest) cash collateral deposit paid over to GE at closing.  From the $2.6 million, Hazelrigg allowed Sigma to recover the approximately $500,000 shortfall in construction funds and then Hazelrigg took the remaining $2.1 million into his personal bank account.  Henry objected to this arrangement for two reasons: (a) Hazelrigg still owed CP3 $1.15 million of the construction funds he had previously looted; and (b) Henry did not think it proper to pay funds directly to Hazelrigg in any event, since he was not to an owner of CP3.  Hazelrigg again was adamant and Aaron was no help.  Hazelrigg also assured Henry he would "take care of it".

3.17    By the end of 2007 and early into 2008, it was clear Hazelrigg was having financial difficulties.  He finally told Henry he had no money, that he could not repay the $2.1 million he had taken or otherwise fund CP3's operational shortfalls.  Eventually, Henry was given the Hobson's choice of having CP3 fail with SMI losing its 10% ownership and Sigma lose its management

COMPLAINT- 13



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

contract, or using Sigma's funds to finance operations - which is what Henry did. There was no other choice, since Hazelrigg's looting emptied CP3's reserves and the GE loan documents prohibited subordinate secured debt.

### Alleged Transfers in Ownership of CP3

3.18    From the beginning, and over repeated complaints from Henry, Hazelrigg was the sole voice for the 90% CP3 owner, including Centurion - CP3's nominal manager at that time. Henry tried to contact Hazelrigg's son Aaron, but Aaron always referred Henry to his father, and let his father make all decisions and respond to all inquiries. In fact, in late 2007 Hazelrigg actually listed the Subject Property for sale - without ever informing the other members, even though Henry's company was a 10% owner and he was the property manager's president. When Henry learned of this matter, he asked Hazelrigg directly why he had not divulged such a major decision to Henry, Hazelrigg informed Henry that he had bought out all the other members, and he had controlling interest. Henry told Hazelrigg that was not possible, since under CP3's operating agreement, SMI had a right of first refusal. Henry also told him that, if true, his purchase triggered yet another a violation of the GE loan documents, as CP3 was required to obtain GE's advance consent (in GE's sole discretion) prior to such a change in ownership. Finally, Henry told him that, if true, his purchase of more than 50% of the ownership interest in CP3 triggered excise tax that exceeded $1.3 million, which had to be paid by the sellers or by him. Hazelrigg derisively responded that he was not going to get GE's consent, that he never paid excise tax and that anybody who did was "stupid," and he did not need to tell anyone what he was doing, that he was going to do what he wanted, regardless of legality.

### False Representations on the Subject Property's Cash Flow

COMPLAINT- 14

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

3.19    In mid 2008 Hazelrigg again tried to sell the Subject Property. Henry again voiced concerns that his actions were unlawful, reminded him he had never produced evidence of a legitimate transfer of ownership, and that he had no authority to list the Subject Property. This time, there was a further problem: in the listing Hazelrigg overstated CP3's cash flow by approximately $300,000 to $400,000 annually. Hazelrigg justified this artificially high number by indicating he was including the property management fees paid to Sigma (which is paid by Battelle as part of its service rent). Henry repeatedly explained to him and his broker that this was unlawful and needed to be corrected: management fees could not be included as cash flow, since Battelle was only reimbursing CP3 for actual expenses - and if CP3 did not pay management fees to a property manager, it could not collect them from Battelle. Moreover, Battelle had negotiated a specific formula for management fees in its contract. Hazelrigg refused to correct the listing. He said he would include the management fees since whoever bought it could negotiate their own rate out of the gross cash flow. Again, Henry told Hazelrigg this was fraudulent because there was an existing contract in place with Battelle and his scheme would be, at best, deceptive to potential buyers.

3.20    Hazelrigg still refused to correct this fraud. He told Henry he could get property management services for much less than what Battelle paid for Sigma's work. Henry again explained the fault with his reasoning: Battelle only paid for the actual charges assessed for management services and that the Facilities Leases simply did not provide for CP3 to make a profit on management fees. At one point Hazelrigg said they could just do a "kick back deal" wherein they could present it to Battelle at "full freight:" the higher rate now charged by Sigma, and then he or the new owner could arrange to a substantial kick back of that fee, so the manager was only paid 1.5%. Henry told him that there were many problems with his scheme, besides being deceptive and illegal, the least being there would not be enough money to operate the property management by a long shot. Henry pointed out that there was little profit built into the property management contract for Sigma as it stood and he would not find competent management who would do it for less; moreover Henry

COMPLAINT- 15

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 395-6092
FAX (206) 325-1424

pointed out that industries studies reflect property management fees run between 3.5%-6% of gross rent depending upon services provided.

3.21    Although the extra cash flow might seem on the surface a small detail when the Subject Property was worth over $70 million, it actually has an exponential impact on a property's valuation because commercial properties are commonly valued by their "cap rate" - which reflects the rate of return on investment through cash flow. Thus Hazelrigg's deception would artificially inflate the Subject Property's perceived value by millions of dollars - which is exactly what Hazelrigg told Henry was his intent in falsely stating cash flow. Hazelrigg again instructed Henry to provide the fake cash flow numbers to the real estate broker, Henry refused and the discussion ended up at an impasse.    In mid 2009, another real estate broker was engaged to market the Subject Property using the fake cash flow numbers and when the broker called to verify the cash flow, Henry told him his numbers were wrong. This time Henry provided the broker with the true cash flow numbers. Hazelrigg and Henry ended up in another argument about this matter.

### Refinancing the Subject Property

3.22    In early 2008, Hazelrigg's lawyer sent Henry a document to sign, a purported "Consent". The Consent states Hazelrigg is the sole member and managing member of Centurion and authorized to represent the Company for any business purpose, including refinancing or financing loans encumbering Company property. Even though Henry received it in 2008 and signed it in March 2008, the Consent was backdated to January 1, 2007. There were no other transfer documents to show how Hazelrigg got that interest and from whom.

3.23    Henry called Hazelrigg when he received the Consent to sign, asking why he needed it and pointing out (again) that he still had not received anything showing he owned the 90% interest in CP3. Hazelrigg told Henry he needed the Consent because he was getting quite close to replacing



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

the GE bridge loan with a new permanent loan from a different lender. Henry told him that before he signed it, he would like to see something to verify he actually had control of the 90% of CP3. He rebuffed Henry's request and pressured him repeatedly to sign the Consent. Henry even tried unsuccessfully to get the transfer documents from CP3's lawyer, who responded "you don't want to know". Given this odd answer, he continued to delay signing the Consent. Eventually, however, Hazelrigg demanded that Henry sign the Consent as written, or he would cancel Sigma's management contract. He reassured Henry he only needed the Consent because he had financing lined up to replace the GE bridge loan, and his delays were jeopardizing the entire refinance. This was at the same time the financial markets were in a tailspin, so his explanation seemed reasonable - get new financing put in place before the new lender backs out. Although Henry was not happy with signing the Consent without some documentation, he now realized that under CP3's operating agreement, the company's manager Centurion could act without his approval regardless of who owned Centurion. Henry also knew that even with the Consent there were limits on what type of financing Hazelrigg could arrange, since both the CP3 operating agreement, the recorded GE deed of trust and the other GE loan documents prohibit CP3 from putting or allowing junior liens to be filed against the Subject Property.

3.24    In May 2008, about two months after Henry signed the Consent, Hazelrigg called telling him he had a group called Equity Funding in his office. He said Equity Funding had him "in a vice" and that he owed them a lot of money. Hazelrigg then told Henry he wanted to give Equity Funding the Subject Property in lieu of the debts he owed them. Henry was in Seattle that day, so he met with Equity Funding in an attempt to figure out what was really going on, why it involved CP3 and how Hazelrigg's proposal would impact Sigma's 10% interest in CP3 and Sigma's property management contract. Until that call, Henry had never heard of Equity Funding but thereafter learned that its principals Joe and Derek Edmonds (father and son), through their companies Equity Funding, LLC ("Equity Funding"), Centrum Financial Service ("CFS") and Trident Investments, Inc., ("Trident"). They had apparently been making numerous deals with Hazelrigg for some time,



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

had placed five liens on the Subject Property - all in violation of the GE loan documents and CP3's operating agreement. They included the following:

(1) a leasehold deed of trust signed by Aaron, for the benefit of CFS recorded on July 10, 2007, which purported to secure a loan from Centrum to CP3 for $10 million in principal made between February and July 2007, although CP3 never received any such loan, it is not in the Company's books, Henry had never seen any note or other loan documents except the recorded deed of trust, and both the GE loan documents and CP3's operating agreement prohibited such secured debt;

(2) a leasehold deed of trust signed by Hazelrigg for the benefit of CFS recorded on March 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave on March 5, 2008 to benefit CFS - no amount is stated in this deed of trust, Henry had never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions;

(3) a leasehold deed of trust signed by Hazelrigg for the benefit of Equity Funding recorded on April 7, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave to benefit Equity Funding - no amount is stated in this deed of trust, Henry had never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions - this is the Deed of Trust which is the subject of the February 26, 2010 Trustee's Sale discussed below, and although the deed of trust refers to a guaranty, the notice of which refers to a promissory note for $3,346,000.

(4) a leasehold Deed of Trust signed by Hazelrigg for the benefit of Trident recorded on November 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave to benefit Trident - no amount is stated in this deed of trust, Henry had never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions;

COMPLAINT- 18

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

(5) a Memorandum of Agreement signed only by Derek Edmonds, listing CP3 as grantor and Trident as grantee recorded November 6, 2008, and describing an underlying agreement whereby all "net sums" that would otherwise be paid to CP3 in connection with the sale of the Subject Property were to be paid by giving CP3 certain, undefined "notes receivable."    Henry had no knowledge of any such purchase and sale agreement and was unaware of any notes payable by CP3 to Trident.

3.25    During Henry's meeting with the Edmonds they told him they ran Equity Funding (since Equity Funding, CFS and Trident were all generically referred to as Equity Funding during discussions). The Edmonds told Henry that Hazelrigg had borrowed a lot of money from them, but they did not say exactly how much. They also told Henry that Hazelrigg had borrowed all of the money he contributed to CP3 for the purchase of the Subject Property and the $5 million cash collateral deposit. Henry was shocked, and replied that Hazelrigg had always told him he was contributing his own funds. Henry also told the Edmonds he did not see how or why CP3's property should be turned over in lieu of Hazelrigg paying back his personal loans. Edmonds then claimed that Hazelrigg had given Equity Funding a secondary deed of trust on the Subject Property as security for Hazelrigg's personal loans. Henry told them that was not possible because GE, the primary lender, did not allow secondary debt and would never have approved such a thing. The Edmonds then conceded that when they originally made loans to Hazelrigg, they were not secured by liens on the Subject Property, but were secured on deeds of trust on other of Hazelrigg's properties located in New Mexico.    They disclosed that it was not until some time later that Hazelrigg granted the secondary deed of trust on CP3's property – to provide additional security for approximately $13.5 million in loans previously made to Hazelrigg.    This was a surprising and shocking disclosure which caused Henry great concern - since neither the GE loan nor CP3's operating agreement allowed secondary liens and this immediately created a default on the GE loan.

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6092
FAX (206) 325-1494

3.26    Regardless of when Hazelrigg gave Equity Funding these liens, Henry told Edmonds that neither GE or CP3 consented to the liens.  Hazelrigg's response was that he did not need to comply with the requirements in the GE loan documents, he also said they (Equity and Hazelrigg) do this type of thing all of the time.  Henry reiterated that to Edmonds (1) the recorded loan documents are very clear in imposing an advance consent requirement, and (2) Hazelrigg did not notify Henry, as a member of CP3 that he was going to violate the GE loan documents and put unpermitted secondary debt on the property.

3.27    Both during that meeting and later, Equity Funding continued pressing Henry to make a deal with them or they would foreclose.  Henry was very concerned and felt he was obligated to tell GE, but Derek Edmonds responded that Equity Funding did not care.  He then determined the best solution would be to pursue refinancing, to see if he could procure sufficient loan proceeds to pay off GE and remove the Equity Funding lien (at that time he was only aware of one Equity Funding lien).  Meanwhile, Hazelrigg spun various tales; at one point telling him he had other properties and he could move the Equity Funding debt onto; and another time telling him he had other ways paying of them off.  During this time he also revealed that at the time Henry signed the backdated Consent, there had not actually been any replacement financing lined up, because there just were not any loans out there to be had.

3.28    In August 2009 GE notified CP3 that it had defaulted on its loan because, in part, there was secondary debt secured by the Subject Property.  GE provided a title report, which is when Henry first learned there were five different liens or other clouds on title in favor of Equity Funding.  The recorded documents did not specifically indicate how much was secured, although Derek Edmonds subsequently informed Henry the debt secured by those liens exceeds $55 million.

### More Ownership Claims

COMPLAINT- 20



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

3.29    One of services Sigma provides as property manager for the Subject Property is to coordinate preparation of CP3's federal income tax return.  In March 2009 Sigma's accountant prepared CP3's 2008 federal tax return using the information Sigma and Henry provided.  In March 2009 Henry sent the completed return to Hazelrigg, to have his son sign on behalf of CP3's managing member.  Hazelrigg did not do so.  Instead he called Henry and informed him that he wanted him to falsify the ownership structure shown on the 2008 tax return to reflect that during 2008 Dan Kirby owned 90%, and SMI 10%.  Henry told Hazelrigg he would not do that.  He did not know anything about a Dan Kirby; never heard of a Dan Kirby; and he knew for a fact that Dan Kirby did not own 90% of this property throughout the 2008 tax year.  Hazelrigg responded that he would create a backdated sale agreement showing that Dan Kirby bought the 90% interest as of January 1, 2008. Hazelrigg told Henry he needed to make this change because he owed Dan Kirby a lot of money, (approximately $8 million) and he wanted to give Dan Kirby the tax credit for his CP3 ownership interests, which would reduce Hazelrigg's overall debt to Dan Kirby.  Henry told him he would not be a party to committing tax fraud.  Henry was determined not to participate in this deception, and accordingly filed a K-1 for CP3 with his tax return, appropriately filled out as he understood the ownership structure to be.  In October, 2009 he received a K-1 from Randy Tanner of Hagen, Kurth, Perman and Co., P.S. a Seattle accounting firm which reflected Dan Kirby as the addressee for CP3.  Henry never saw a signed and filed 2008 federal tax return for CP3.

3.30    In late January, an employee of Sigma received a telephone call from Randy Tanner, who indicated he is Dan Kirby's accountant, that Dan Kirby is the 90% owner of CP3 and he needs CP3's 2009 yearend financial reports to complete CP3's taxes and that Hazelrigg had prepaid Randy Tanner to expedite completion of the 2009 tax return.  Henry also received an e-mail from Hazelrigg, instructing him to provide Dan Kirby's accountant with this information.  Henry has not responded since he believes he would be facilitating a fraud on the I.R.S.

## Changing Managers & Ownership Percentages



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

3.31    In September, 2009 GE notified CP3 that it was also in default because CP3 had been administratively dissolved by the Secretary of State. Henry then discovered that CP3's manager Centurion (Aaron's company) had also been dissolved by the State. Upon investigation Henry learned both CP3 and Centurion had been dissolved because their registered agents had resigned in March, 2009 and the companies' managers failed to designate new registered agents within 90 days thereafter. Henry repeatedly tried to get Hazelrigg and Aaron to reinstate the companies, but they failed to act. Since he did not have authority to act as a manager for CP3 at that time he could not reinstate CP3 on his own. Eventually, Hazelrigg and Aaron agreed to designate SMI as CP3's manager, so Henry could get the company reinstated. Henry did this and also procured and prepared the documents to get Centurion reinstated.

3.32    During this same time, Henry continued to search out replacement financing and remained concerned that Hazelrigg or Aaron might try and place more bogus liens against the Subject Property or take other alleged or impermissible actions. It would be pointless to locate and front the due diligence fees to a prospective lender if CP3 could not remove the numerous clouds on title that Aaron, Hazelrigg and Edmonds apparently placed. Henry needed to confirm that his company, SMI, would be the sole manager, that no major decision could be made without SMI's consent and that he would need to personally finance any attempt to refinance or extend the term of the GE loan. In November, 2009 he asked Hazelrigg and Aaron to agree to increase his ownership to 25% (transferring it internally from Aaron to me), and amend CP3's operating agreement to require a vote of 76% of the membership for major decisions. They reluctantly agreed. Since amendments to CP3's operating agreement can be made by a majority of the members, and since Hazelrigg had repeatedly informed Henry that the named owners (other than SMI) were mere figure heads and he actually owned those interests, Henry asked both Aaron (on behalf of Centurion) and Hazelrigg to sign and acknowledge the above described changes, confirm that Hazelrigg was not an

COMPLAINT- 22



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6092
FAX (206) 325-1424

owner, that Hazelrigg did <u>not</u> have any authority to act on behalf of CP3, and that the ownership of CP3 was now as follows:

> Aaron Hazelrigg (through Centurion) 63%
>
> Nicole Kelly 10%
>
> Patrick McCourt 1%
>
> Barclay's North 1%
>
> SMI Group XIV, LLC 25%

3.34    The amendment to CP3's operating agreement, signed in November 2009 by both Hazelrigg and Aaron, confirmed that SMI Group XIV, LLC was CP3's sole manager and the only entity with authority to sign on behalf of CP3 and that such designation could not be changed without the vote of the holders of at least 76% of the membership interest. Since then there has been no change in the manager, as Henry has not voted for a change in manager, and SMI Group XIV's vote is needed to make such a change.

3.35    Henry was quite surprised when, on February 1, 2010, Derek Edmonds e-mailed him a contract between CP3 and Equity Funding, dated January 29, 2010, which Hazelrigg purportedly signed as "its member and director of Plaintiff, by Centurion Management III, LLC" and indicated that Tom Hazelrigg, through Centurion management, was signing the contract on behalf of CP3 - and that Centurion was CP3's manager. Henry had not approved that contract, which would waive all claims CP3 has against Equity Funding and allow Equity Funding to complete a "friendly" foreclosure of the property. The agreement talks of allowing a local principal (which Derek Edmonds said was Henry) to take a membership interest in the new Property owner. Accordingly, what this latest agreement really attempts is a transfer of Hazelrigg's 75% interest in CP3 to Equity Funding in a manner which circumvents Hazelrigg's excise tax obligations of over $1 million, which would have been due the state and county had Hazelrigg directly transferred his membership interests to a new entity.

COMPLAINT- 23



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

### Refinancing Efforts & Equity Funding's Claim

3.36    Once Henry was able to take control of the management of CP3 he contacted GE and provided them with copies of the documents designating him as manager and reinstating the companies. GE informed Henry that Derek Edmonds wanted to talk to them about restructuring the GE loan and asked if he would consent to such discussions. With no immediately viable option and the November 30, 2009 maturity date looming, Henry agreed to allow such discussions. At that time Henry thought Equity Funding was claiming lien rights of approximately $13 million, which he thought could be comprised in a replacement loan.

3.37    Henry also contacted Derek Edmonds and asked to remove all the junior liens. Derek Edmonds demanded $10 million, indicating he could get the balance from what Hazelrigg owed from other properties of Hazelrigg's. Although Henry did not think any of these Equity Funding liens were valid, $10 million was much closer to the unsecured "member loans"from Hazelrigg that he had his other companies make CP3 at the outset, so he decided that if CP3 paid $10 million to remove all the invalid liens and if it also cleared the initial "member loans "from Hazelrigg, then paying Equity Funding was a possible solution. Henry continued to work diligently and located a viable lender and negotiated a replacement loan. He also negotiated a month extension with GE on their loan and worked toward closing the replacement loan by the end of 2009. During that time Equity Funding had recorded a notice of trustee's sale for one of their liens against the Subject Property, setting February 26, 2010 as the foreclosure sale date. Since Henry knew they would accept $10 million to remove all their liens he was not overly concerned.    He retracted the agreement he had previously signed allowing Equity Funding to negotiate with GE.

3.38    In the end Henry was not able to close the replacement financing by year end, and he requested a three month further loan extension from GE. GE denied this request, citing their concern

COMPLAINT- 24



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

with the Equity Funding notice of trustee's sale. Henry was informed that it was incumbent that he get the notice withdrawn before they would discuss an extension.   He then contacted Derek Edmonds, explaining that his notice had hobbled efforts to obtain the replacement financing, and asked for his cooperation. Edmonds then informed Henry that he now wanted $20 million to remove the liens, not $10 million as he had previously stated.   $20 million was extortionate, particularly in light of the bogus nature of Equity Funding's debt.

3.39    Without a new extension or forbearance from GE, GE's loan had now matured and was due in full. GE posted and served its default notice on the Subject Property and CP3 on January 8, 2010.   This is the first statutory step in GE foreclosing their deed of trust.   GE had already implemented a process whereby Battelle makes all rent and service rent payments into a bank lockbox account controlled solely by GE (a "hard lock box"). GE then pays out the service rent back to Sigma, upon proof of expenditures. Any balance after servicing their debt is kept by GE and added to CP3's cash collateral balance. CP3 does not receive any revenue. Since GE has declared the loan in default, however, the interest rate on the loan escalated from 6% to 12 % and GE is applying all revenues to debt service (after paying actual operating costs).

3.40    In the last several weeks both Derek Edmonds and Hazelrigg have approached Henry and asked him to consent to a deed in lieu of foreclosure on Equity Funding's deed of trust, promising him a substantially similar ownership interest in the new ownership entity. In addition to his concerns about acting as CP3's manager, Henry raised concern over who would pay the approximately $1.34 million in excise tax. Again he was told he was being naïve, but they would also consider structuring it as a collusive judicial foreclosure so Hazelrigg could avoid excise tax. Again Henry raised a concern over this scheme to avoid excise tax and it was again dismissed. Hazelrigg then demanded that Henry additionally pay his designee Eric DeGooyer a monthly stipend of $10,000, plus a 20% interest in the proceeds of Henry's ownership interest, in exchange for getting all of the CP3 members to consent to allow Henry to enter into an arrangement with Equity

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(906) 325-6092
FAX (906) 325-1494

Funding and facilitate the purported "tax free" transfer of the Subject Property to an Equity Funding company.

3.41   Finally, Edmonds forwarded, on February 1, 2010, an agreement executed by Tom Hazelrigg, who has no record interest in CP3 in which Hazelrigg purports to waive any and all defenses CP3 might have to Equity Funding's impending foreclosure.

## IV.  FIRST CLAIM: INJUNCTIVE RELIEF

4.1   Plaintiffs are entitled to injunctive relief to prevent the loss of approximately $10 million in equity under both the deed of trust act, RCW 61.24, and Criminal Profiteering Act, RCW 9A.82. Additionally, the Deceptive Practice Act, RCW 19.86, also confers power on the courts to grant equitable relief.

4.2   This Court should enjoin all defendants and their agents from encumbering the plaintiffs' property and from foreclosing on illegal liens placed upon the property.

## V.  SECOND CLAIM: CIVIL CONSPIRACY

5.1.   Defendants and their agents are all participating in a plan to strip the equity from the subject property, by unlawful means, as herein alleged. Each defendant is therefore liable for the acts of the others in advancing the plan to take, by illegal means, the equity in the property.

## VI.    THIRD  CLAIM: CRIMINAL PROFITERRING: RCW 9A.82.010

6.1     As alleged above, the conduct by defendants is the collection of an illegal debt prohibited by RCW 9A.82.045, and that the enforcement of repayment by intimidation with threats of taking the property., and stripping equity without lawful authority unless plaintiffs commit tax fraud, pay an extortionate rate of return, and shields defendant Tom Hazelrigg III from lawful creditors, all violates the Washington Criminal Profiteering Act, RCW 9A.82.

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

6.2    Defendants , and perhaps others, are engaged in an ongoing criminal enterprise by placing illegal liens on this subject property and also property of other citizens of the State of Washington, as defined by RCW 9A.82.010(4). Similar practices of most of the same defendants are being litigated in <u>Third Century LLC v. Centurion Financial Group, LLC, Tom Hazelrigg, et al,</u> King County No. 08-2-11861-4 SEA; and <u>Auburn Ace, LLC v. Centrum Financial Group, LLC,</u> U.S.D.C. (W.Dist. No. 09-CV-0909-RSL).

6.3    Hazelrigg, and others are attempting  or have engaged in at least three criminal profiteering acts as defined by RCW 9A.82.010(12), including (1) usury and extortion (by the amount demanded to stop the foreclosure) , (2) federal income tax fraud,  (3) fraud to avoid $1.3 million in excise tax, (4) equity stripping,  (5) and activities outlined in the  cases cited in Par. 6.2 above.

6.4    Plaintiff is entitled to all civil remedies allowed under RCW 9A.82.100, including:

(1)    Forfeiture of Hazelrigg's (and his alter ego entities) or other defendants' interest in the plaintiff's property, and;

(2)    Judgment for damages plaintiffs  have suffered by the defendants' acts or omissions;

(3)    Treble damages limited to $100,000 for each violation of law because defendants have acted in bad faith;

(4)    Recovery of all costs and expenses (including attorney's fees) related to this lawsuit, and

(5)    Injunctive relief preventing defendants from foreclosing on  plaintiff's property.

### VII.  FOURTH CLAIM:  BREACH OF FIDUCIARY DUTY

7.1.  Hazelrigg and his confederates have violated their duty owed to other members of Plaintiff as herein alleged entitling Plaintiff to recover consequential damages.

### VII.  FIFTH CLAIM:  QUIET TITLE

8.1 The liens placed upon the property with the assistance of Hazelrigg and other defendants should be removed as void and without lawful authority. The Court should quiet title in favor of Plaintiff as to these liens.

COMPLAINT- 27

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

## IX. SIXTH CLAIM: CORPORATE DISHONESTY: FORFEITURE OF INTEREST

9.1   Hazelrigg's dishonest conduct as herein alleged  violates the doctrine of corporate dishonesty entitling the other members of plaintiff to recoup their damages from the interest of the dishonest member.

## X. SEVENTH CLAIM: VIOLATION OF WASHINGTON DECEPTIVE PRACTICE ACT

10.1.   The acts and omissions as herein alleged constitute unfair and deceptive acts and practices, are undertaken by defendants in trade or commerce, with a likelihood that other citizens can be harmed by similar conduct, entitling the Plaintiff to damages, treble damages, and recovery of reasonable attorney fees and costs.

## XI. EIGHTH CLAIM: CONVERSION

11.1   Defendants have converted some or all of the equity of the property to their selves and judgment should be granted thereon in favor of Plaintiffs.

## XII. NINTH CLAIM: REALLOCATION OF MEMBERS INTEREST

12.1.   This court should exercise equitable powers and reallocate the proper interests of the members of the Plaintiff, based upon an accounting, damages caused by defendants, and based on the equities as proved at the time of trial.

## XIII. RECOVERY OF ATTORNEY FEES AND COSTS

13.1.   The Plaintiffs are  entitled to recovery of reasonable attorney fees and costs under the statutes set forth herein, including RCW 9A.82, RCW 19.86, and based upon various contracts which provide for the recovery by the prevailing party of fees and costs.

WHEREFORE, Plaintiff prays for the following relief:

1.  That the Court enjoin the pending non judicial foreclosure of the plaintiff's property;

2.  That the court exercise its equitable powers and grant relief that is appropriate and just;

3.  That Plaintiffs be awarded damages;

4.  That Plaintiff's property be quieted in its favor  as to  the liens placed on the property without lawful authority;

5.  That the Court grants other relief that may be just and equitable.

COMPLAINT- 28



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

DATED this 2nd day of February, 2010.

_____
David A. Leen                    WSBA #3516

Kathleen Hopkins
Real Property Law Group, PLLC
1326 Fifth Avenue, Suite 654
Seattle, WA 98101
(206) 625 0404

## VERIFICATION

STATE OF WASHINGTON    )
                       ) :ss.
COUNTY OF ~~KING~~ BENTON    )

    Michael Henry duly sworn upon oath deposes and states that he has read the foregoing, that he knows the contents thereof, believes the same to be true to the best of his information and belief.

_____
MICHAEL HENRY

Dated this 3rd day of February, 2010.

**SUBSCRIBED AND SWORN** to before me this 3rd day of February, 2010.

_____
Type or print name: Bonnie L. Asher
NOTARY PUBLIC in and for the State of
Washington residing at Bremerwick
Commission Expires: 2-1-2011

COMPLAINT- 29

COPY RECEIVED
LAW OFFICE

FEB 0 4 2010

JIM DENTON

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

| | |
|---|---|
| CENTURION PROPERTIES III, LLC SMI GROUP XIV, LLC, | NO. 10 - 2 - 00301 - 8 |
| Plaintiffs, | |
| v. | **NOTE FOR MOTION DOCKET** (Clerk's Action Required) |
| TOM HAZELRIGG III; AARON HAZZELRIGG, , | **MORE THAN 10 MINUTES** |
| Defendants. | |

**TO: THE CLERK OF THE COURT, and to all those listed on Page 2:**

    **PLEASE TAKE NOTICE** that an issue of law in this case will be heard on the date below and the Clerk is directed to note this issue on the civil motions calendar.

**Nature of Motion:** Motion to Enjoin Trustee's Sale

**Date of Hearing (Provide day, date & time):** Friday, February 12, 2010 at 1:30 pm

**Place of Hearing:** Presiding Judge's Courtroom (Honorable Bruce Spanner)

**Address, City & Zip:**  Benton County Courthouse
              7122 W. Okanogan Place, Bld. A
              Kennewick, WA 99336

    DATED this 3rd day of February, 2010.

COMPLAINT- 1

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424



David A. Leen                                    WSBA #3516
Attorney for Plaintiffs

**LIST NAMES, ADDRESSES & TELEPHONE NUMBERS OF ALL PARTIES REQUIRING NOTICE**

| | |
|---|---|
| Counsel for Trustee: | Jim Denton<br>1501 4th Ave Suite 2150<br>Seattle, WA 98101<br>(206)223-1244 |
| Counsel for Equity Funding and Related Entities: | Bruce Berreth<br>12503 Bell Red Road #200 .<br>Bellevue, WA 98005<br>bberreth@equity_funding.com |
| Counsel for GE Capital: | Steven Cardoza<br>4th Floor<br>650 Town Center Drive<br>Costa Mesa, CA 92626-1925<br>(714)424-8234<br>scardoza@sheppardmullin.com |

COMPLAINT- 2



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

1

2                                                           Hearing Date: Friday, February 12, 2010
                                                                                Time: 1:30 PM
3                                                                          Civil Motions Calendar

4                                                                    MORE THAN 10 MINUTES

5                                               COPY RECEIVED
                                                LAW OFFICE
6
                                                   FEB 0 4 2010
7
                                                   JIM DENTON
8
                    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
9                              IN AND FOR THE COUNTY OF BENTON

10
     ,
11                                                        NO. 10-2-00301-8
     Centurion Properties III, LLC, a Washington
12   Limited Liability Company, et al,
     Plaintiffs,
13                                                        **MOTION TO ENJOIN TRUSTEE**
                                                          **SALE SET FOR February 26, 2010**
14
                    v.
15

16   Tom Hazelrigg III, et al,
17                          Defendants.

18

19
                                    **I. RELIEF REQUESTED**
20
            Plaintiffs ask the court to grant a preliminary injunction against the sale of its property, the
21
     Battelle Memorial Institute Campus in Kennewick, Washington, now set for February 26,2010, in
22
     Kennewick,  Washington until such time as the merits of the complaint can be resolved.
23

24                                         **II. FACTS**

25          2.1  This lawsuit involves property legally described as follows:

26

27

28   MOTION TO ENJOIN TRUSTEE SALE                         Leen & O'Sullivan,
     SET FOR February 26, 2010- 1                                                  PLLC
                                                                              520 EAST DENNY WAY SEATTLE,
                                                                                 WASHINGTON 98122
                                                                                  (206) 325-6022
                                                                                FAX (206) 325-1424

"**Property**": all estate, right, title, interest, claim and demand whatsoever which Borrower now has or hereafter acquires, either in law or in equity, in possession or expectancy, of, in and to (1) the leasehold estate in the "Land" (as defined below), created by (A) that certain Land Lease Agreement No. 052241-C-N2 dated as of June 15, 1990, by and between Battelle Memorial Institute, an Ohio non-profit corporation ("**Battelle**"), as landlord, and SIGMA Financial Group VI, L.P., a Washington limited partnership, predecessor-in-interest to Borrower, as tenant, a memorandum of which was recorded on September 20, 1990, in the Official Records of Benton County, Washington (the "**Official Records**") as Recording No. 90-15933, (B) that certain Land Lease Contract No. 146541-D-N2 dated as of January 31, 1991, by and between Battelle, as landlord, and SIGMA Financial Group VII, L.P., a Washington limited partnership, predecessor-in-interest to Borrower, as tenant, a memorandum of which was recorded on July 26, 2006, in the Official Records as Recording No. 2006-024100, (C) that certain Land Lease Agreement No. 169833-D-N2 dated as of June 22, 1992, by and between Battelle, as landlord, and SIGMA Financial Group VIII, L.P., a Washington limited partnership, predecessor-in-interest to Borrower, as tenant, a memorandum of which was recorded on October 8, 1992, in the Official Records as Recording No. 92-25097, (D) that certain Land Lease Agreement No. 248370-D-N2 dated as of November 16, 1993, by and between Battelle, as landlord, and SIGMA Financial Group IX, L.P., a Washington limited partnership, predecessor-in-interest to Borrower, as tenant, a memorandum of which was recorded on March 18, 1994, in the Official Records as Recording No. 94-9708, and (E) that certain Land Lease Agreement No. 40410-D-N2 dated as of July 23, 2002, by and between Battelle, as landlord, and SIGMA Financial Group X, L.P., a Washington limited partnership, predecessor-in-interest to Borrower, as tenant, a memorandum of which was recorded on July 31, 2002, in the Official Records as Recording No. 2002-029626 (as amended from time to time, collectively, the "**Ground Leases**"), including, without limitation, (i) all

The subject property is the Battelle Memorial Institute Campus in Kennewick, located at 3200 – 3350 Q Avenue, 620 Battelle Blvd., Richland, WA, and  which was developed by Michael Henry's company, Sigma Management, Inc.  Mr. Henry is also the owner of SMI Group XIV, LLC, which is the Plaintiff's sole manager.  The Plaintiff is the owner of the leasehold interests, constituting the "property".  After the five buildings were constructed, Mr. Henry acquired the leasehold interests, with Battelle keeping the ownership of the "ground" under long term leases. The value of the Plaintiff's interest is approximately $75 million and is supporting a senior loan from GE Capital of approximately $60 million. Through illegal actions and with the assistance of one of the members of the Plaintiff, Tom Hazelrigg, , defendants have placed another $53 million of liens on

MOTION TO ENJOIN TRUSTEE SALE
SET FOR February 26, 2010- 2

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

the property creating a default on the senior lien, making it impossible to obtain permanent financing on the property and jeopardizing the owner's considerable equity. Because of this, GE Capital has advised the plaintiff that it will be filing a receivership action in the event plaintiff does not restrain the sale and proceeding with a foreclosure because of the defaults. See generally, Declaration of Michael Henry, filed herewith.

### III. STATEMENT OF ISSUES

A. Does the Trustee have authority to conduct this sale when the liens are void?

B. Is there a defense to the foreclosure based upon lender misconduct and actions of the defendants in failing to comply with Washington law?

C. Should the court waive additional bonding beyond keeping the senior loan current?

### IV. EVIDENCE

This motion is based upon the verified complaint, the declaration of Michael Henry, and the records and files herein.

### V. LAW AND ARGUMENT

A. **Bonding.**

There are at least three reasons why there should be no bond imposed to restrain the sale, other than maintain the debt service on the senior, $58 million loan:

1. Equity Funding had no expectation that the loan would be repaid. In its dealing with Hazelrigg, it was familiar with Hazelrigg's business dealings and knew that Hazelrigg was in financial distress. Originally the liens put on the Battelle property were originally on other



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

properties of Hazelrigg.  These liens were not purchase money, refinance, or for improvements and

Equity Funding knew this.  Hazelrigg is also attempting to facilitate the foreclosure sale (coupled

with a deal to transfer his interest to others, breaching his duty to the other members of Centurion

Properties III, LLC, and acting contrary to the LLC agreement which places Sigma Management as

the managing agent.

2.  Equity Funding knew that Hazelrigg did not have authority to enter into the transactions

whereby liens, greatly exceeding the value of the equity in the property, were recorded.  Indeed, the

another similar case, officers (Elizabeth Baker and Kerek Edmonds) of Centrum Financial Services,

Inc., the agent of Equity Funding LLC, which signed the notice of default to start this foreclosure,

testified in another similar racketeering  case as follows:

> **Q. … What does Centrum do when somebody comes in to the**
>
> **company and says, I have authority to sign on**
>
> **behalf of a particular entity? What investigation does**
> **Centrum do to verify or determine whether that**
> **representation is correct?**
> **A We don't investigate that, usually.[54]**
> **. . .**
> **Q … You don't require the borrower to provide to**
> **Centrum a resolution of authority?**
> **A I do not require that, no. Centrum does not require**
> **that.[55]**
>
> -
> . . .
>
> **Q Is it Centrum's policy that when it's going to issue a**
> **loan to a company, that it actually verifies whether the**
> **person who is signing for the loan on behalf of the**
> **company has the actual authority to do so?**
> **A No, it is not.[56]**

[52] Baker, 8:11-23; Berreth, 12:24 to 13:7.
[53] Edmonds, 26:12-20; Baker, 70:7-11.
[54] Berreth, 23:20-25 (emphasis added).
[55] Baker, 30:7-10 (emphasis added).



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

See, Brief of Appellant, in <u>Auburn Ace v. Centurium Financial, Centrum Financial,</u>

<u>Hazelrigg, et al.</u>, No. 09-0909 RSL, United States District Court (WD WA). The footnotes

immediately above are from that brief and refer to deposition testimony of Baker and Edmonds.

3. Because Equity Funding is relying on Title Insurance rather than a legitimate promise to

make payments, and does not even care if Hazelrigg had authority to lien up the property, they

should be estopped from demanding that a bond be posted.  Any search of the recorded records

would show that the senior lender did not allow junior liens and most companies would have an

express resolution before any individual could borrow $53 million which did not improve or add any

value to the property.  Moreover, the liens were not performing loans so there was no expectation of

payments, only an effort to seize the assets.

In this case, the debt being foreclosed is  likely void because  (1) the debts and deeds of trust

were not approved or authorized  by the members of the grantor, Centurion Properties III, LLC,  a

Washington Limited Liability Company  (2)  the beneficiary, Equity Funding, knew or should have

known that the senior lender, GE Capital, in its recorded deed of trust, prohibited encumbering the

property and (3)  that the lender and other defendants, including defendant Tom Hazelrigg, were

engaged in a civil conspiracy to defraud the plaintiffs of its equity in the property.  On January 29,

2010, Tom Hazelrigg, without any authority to act on behalf of Centurion, entered into an agreement

stating that there were no defenses to this foreclosure.  This facially harmful and collusive

agreement, proves that he is not acting on behalf of the best interests of Centurion  and that he is

working with Equity Funding to strip this equity. See, Declaration of Mike Henry.

.      The law is well settled that a court can waive an injunction bond notwithstanding statutes or

regulations  under its equitable powers:

The  writ  of  injunction  is  the 'strong  arm  of  equity.'    So  any



Leen & O'Sullivan,
PLLC
590 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6092
FAX (206) 325-1424

> legislation that diminishes the superior court's injunctive authority is void. *State v. Werner*, 129 Wn.2d 485, 496, 918 P.2d 916 (1996) (citing *Blanchard v. Golden Age Brewing*, 188 Wash. 396, 415 (1936). And we narrowly read exceptions to superior court jurisdiction. *Orwick v. Seattle*, 103 Wn.2d 249, 251 (1984). Unless the Legislature clearly indicates its intention to limit jurisdiction, statutes should be construed as imposing no limitation.

Bowcutt v. Delta, 95 Wn. App. 311, 319 (1999 – Div. III).

In Bowcutt, a case similar to the facts herein, the plaintiff sought to enjoin a nonjudicial sale pending resolution of their suit for violation of the criminal Profiteering Act, RCW 9A.82, which also authorizes plaintiff's to obtain equitable relief, including injunctive relief. 95 Wn App. At p. 319. The defendants here have violated the RICCO act by (1) attempting to avoid paying state excise tax of $1,300,000 (2) attempting to file false tax returns hiding defendant Halzelrigg's interest in the property; (3) stripping plaintiff's equity from the property by placing bogus deeds of trust and liens on the subject property. (4) one member (Hazelrigg) facilitating a collusive foreclosure sale. The court held:

> We also conclude that the court may restrain the nonjudicial foreclosure under the criminal profiteering statute without the bond required by the Deeds of Trust Act. The court therefore erred by conditioning the homeowners' injunctive relief on payment of a bond equal to the obligation secured by the deed of trust. We therefore reverse and remand.

.Id. at page  315.

In this case, the plaintiff proposes that he nevertheless pay  the required debt service on the senior loan to GE Capital in the amount of $554,469 per month, which is now being collected in a "lock box" put in place because of the illegal activities of defendants.. Because the defendants never had a legitimate expectation that monthly interest payments would be forthcoming, and  never contributed any value to the property, this should adequately protect them until the merits of the case are resolved.

MOTION TO ENJOIN TRUSTEE SALE
SET FOR February 26, 2010- 6

Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

**B.   The Deed of Trust and Statute Authorizes Restraint of a Trustee's Sale to Protect Legal and Equitable Rights of a Party in Interest.**

This motion is brought pursuant to RCW 61.24.030(7)(j), RCW 61.24.040(1)(f) and RCW 61.24.130(1) as well as the RICCO act, RCW 9A.82  which authorizes injunctive relief.

RCW 61.24.030(7)(j) requires that the Notice of Default contain the following language:

> That the borrower, grantor, and any guarantor has recourse to the courts pursuant to RCW 61.24.130 to contest the alleged default on any proper ground.

RCW 61.24.040(1)(f) requires the notice of trustee's sale to contain the following paragraph:

IX

> Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130.

RCW 61.24.130(1) states in part:

> Nothing contained in this chapter shall prejudice the right of the borrower, grantor, any guarantor, or any person who has an interest in, lien, or claim of lien against the property or some part thereof, to restrain, on any proper ground, a trustee's sale.

In <u>Koegel v. Prudential Mut. Sav. Bank</u>, 51 Wn. App. 108, 113, 752 P.2d 385 (1988), the court held that:

> the streamlined procedures of nonjudicial foreclosure leave debtors with minimal protections, necessitating close scrutiny of those procedures by our courts...

In addition, the provisions of the deed of trust statute require strict compliance and the statute is to be strictly construed:

> The deed of trust statutes codified in chapter 61.24 RCW allow a trustee to sell a property without a judicial process.  Because these statutes remove many protections borrowers have under a mortgage,

MOTION TO ENJOIN TRUSTEE SALE
SET FOR February 26, 2010- 7



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

lenders must strictly comply with the statutes in the borrower's favor.

Amresco Independence Funding, Inc. v. SPS Properties, LLC, 129 Wn. App. 532, 536-7, 119 P.3d 884 (2005) (Citations omitted); Koegel, 51 Wn. App. at 111-2.

Accordingly, plaintiff is entitled to have the court enter an order restraining the trustee's sale on any proper ground. Such grounds have been shown.   There is a sufficient showing that the foreclosure is fatally defective because the defendants have conspired to strip the equity of the property and have engaged in criminal and otherwise illegal activities.

A proposed Order is submitted herewith.

DATED this  3 day of February 3, 2010.

David A. Leen                    WSBA #3516
Attorney for Plaintiffs

Kathleen J. Hopkins
Real Property Law Group, PLLC
1326 Fifth Avenue, Suite 654
Seattle, WA 98101
Phone: (206) 625-0404
Fax: (206) 374-2866
email: khopkins@rp-lawgroup.com

MOTION TO ENJOIN TRUSTEE SALE
SET FOR February 26, 2010- 8

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

COPY RECEIVED
LAW OFFICE

FEB 0 4 2010

JIM DENTON

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF BENTON

CENTURION PROPERTIES III, LLC; SMI
GROUP XIV, LLC,

               Plaintiffs,

      v.

TOM HAZELRIGG III;s et al,

               Defendants.

NO. 10-2-00301-8

DECLARATION OF
MICHAEL HENRY

    Under penalty of perjury under the laws of the State of Washington, the undersigned declares as follows:

Background

1.    I am over 18 years old, am competent to testify, and have personal knowledge of the facts recited below.

2.    My wife and I are life-long residents of the Tri-Cities, product of their schools and Washington State colleges. We raised our two sons in the Tri-Cities and they also attended local schools and Washington State colleges.

3.    I have been a business owner and property manager in the Tri-Cities area for approximately 20 years. I own eight different companies specializing in commercial real estate property, construction and property maintenance, including Sigma Management, Inc., a Washington

DECLARATION OF MICHAEL HENRY - 1



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

1  corporation ("Sigma") which is a property management company. Collectively, my businesses

2  currently employ approximately 20 people in the Tri-Cities area.

4  4.    Of interest in the present matter, I am the president of Sigma. I am also the sole member of

5  SMI Group XIV, L.L.C., a Washington limited liability company ("SMI"). SMI presently owns a

6  25% membership interest in Centurion Properties III, LLC, a Washington limited liability company

7  ("CP3") and, since September 25, 2009 SMI has been the sole managing member of CP3.

8  The Subject Property

11 5.    The property, which is the subject of this action, is a portion of the property known locally as

12 the Battelle Memorial Institute Campus. The subject property (the "Property") consists of five

13 buildings, related improvements and common areas located on the Battelle campus, which is part of

14 the Pacific Northwest National Laboratory.

17     The buildings were constructed between 1990 and 2002 to Battelle's specifications. The

18 construction of the buildings was originally bid out and awarded to Sigma as the developer. Sigma

19 was the project manager during construction and has served continuously since then as the property

20 manager. Four of the buildings (which comprise 90% of the Property) are used as Class A office

21 space and computer-server/data centers. The fifth building is an 84-bed facility for residential

22 housing, used by the tenant to accommodate both short and long term stay on the campus. The total

23 buildings comprising the Property encompass approximately 340,000 square feet. The Property is

25 currently used by approximately 1,200 Battelle staff and visitors.   Initially I was employed by the

26 owners of Sigma, handling the construction and managing the Property. In 2002, I purchased Sigma

28 DECLARATION OF MICHAEL HENRY - 2



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

from its owners, and have been its president ever since.    Prior to then, Sigma had been owned by R.J. and Diane Hoch, who also owned the Original Ground Tenant (as that term is defined below).

6.    The land under the five buildings is actually still owned by Battelle.    Battelle originally ground leased that land to Sigma Financial Group entities (the "<u>Original Ground Tenant</u>") under five separate, long term ground leases (the "<u>Ground Leases</u>").    The Original Ground Tenant owned the buildings and related improvements located on the  land, even though it did not own the land.  After completion of the buildings and improvements, the Original Ground Tenant leased those buildings and improvements back to Battelle through five separate shorter term facilities leases (the "<u>Facilities Leases</u>").  Accordingly, Battelle is both the ground landlord and the facilities tenant for each of the five buildings.  Under the Ground Leases, the ground tenant pays Battelle ground rent.  Under the Facilities Leases, Battelle pays its landlord (i.e. the ground tenant) a base rent amount, and also "<u>service rent</u>" which includes all actual, documented and approved expenses incurred in connection with each portion of the Property (<u>e.g.</u> property management fees, maintenance, etc...).

## CP3 Formation & Acquisition

7.    In 2006, the Original Ground Tenant decided to market its interests in the Property and, subsequently, my company SMI Group XIV, LLC entered into an agreement to purchase all of the Original Ground Tenant's interests in the Property from the Original Ground Tenant, <u>i.e.</u> all of its (a) leasehold interest as ground tenant under the Ground Leases,  (b) interest as facilities landlord under the Facilities Leases, and (c) interest as the owner of the buildings and improvements located on the land (collectively (a)-(c) is referred to as the "<u>Subject Property</u>" and excludes the underlying ground

DECLARATION OF MICHAEL HENRY - 3



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

- which remains owned by Battelle).   There was at least one other entity interested in purchasing the Subject Property, and if I was unable to close on the purchase in a timely manner, the sellers warned me they would sell to the other entity.  I was also told the other potential purchaser was willing to pay more and, more importantly, had its own property management affiliate.  Although Sigma had a long-term property management contract for the Subject Property, it could be terminated by a new owner.  Thus closing on the purchase meant not only acquiring the Subject Property, but assuring the continuation of Sigma's contract.

To close on the purchase, I began working with General Electric Capital Corporation ("GE") as a possible lender.  I already had a business relationship with GE, as I had recently closed on another deal with them as my lender. For this deal, GE required I line up additional investors before GE would commit to making the acquisition loan.  Accordingly, I started looking for other business people with adequate credit and funds to satisfy GE's criteria.   In August 2006, I was introduced to and met with Thomas R. Hazelrigg III ("Hazelrigg").  During our meeting Hazelrigg expressed interest in investing in the project and informed me that he had substantial financial wherewithal, which would be sufficient to meet GE's requirements and allow us to close on the purchase agreement.   GE approved Hazelrigg as an investor, which was consistent with my impression that Hazelrigg was a shrewd businessman with substantial wealth and good credit.  We ultimately were able to close on the purchase in November, 2006 for $74.5 million, with a 10% down payment and using a three year bridge financing loan from GE for the balance, and certain limited personal guarantees for $5 million in aggregate.

DECLARATION OF MICHAEL HENRY - 4



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

8.     The purchasing entity was originally going to be a newly formed limited liability company: CP3. CP3 was going to be 90% owned by Hazelrigg and 10% by my company SMI.  I was to contribute the purchase agreement, my information on the property, my long relationship with the tenant and my relationship with GE; Hazelrigg was going to pay the 10% down payment, with the understanding that he would get a preferred return out of the cash flow until he was repaid the entire down payment.  In addition, Hazelrigg would provide any loan guaranty, if required.  Otherwise, all cash flow and proceeds would be split 90/10. Initially I asked for a 25% interest, given the value I thought I brought to CP3, but after numerous discussions with Hazelrigg, he indicated he had numerous other properties that he would be looking to partner with me on the same 90/10 split and Sigma would get management contracts out of these other properties throughout the country. Accordingly, considering future business opportunities for entering into this business relationship with him, I agreed to the 90/10 split rather than the 75/25.

9.     The final documentation for CP3 did not quite match my discussions with Hazelrigg, but by the time I received the documentation to review and approve, I had no choice to accept his arrangement or walk away and lose Sigma's management contract, as my exclusive right to purchase the Subject Property was going to expire and I had no other investors lined up who could satisfy GE's requirements.    In the end, Hazelrigg decided to have his children and close friend take the 90% interest, have one of his children act as CP3's manager and the final ownership structure and management of CP3 was as follows:

- 78% to Hazelrigg's son Aaron Hazelrigg ("Aaron"), through his company Centurion Management III, LLC, a Washington limited liability company ("Centurion") (at the time I

DECLARATION OF MICHAEL HENRY - 5



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

was told Aaron was the sole owner of Centurion) - Centurion was also named CP3's sole manager;

- 10% to Hazelrigg's daughter Nicole Kelly individually,

- 1% to Hazelrigg's friend Patrick McCourt;

- 1% to Barclay's North, LLC (Patrick McCourt's company)

- 10% to my company, SMI.

In addition, instead of a capital contribution by Hazelrigg or his designees with a preferred return, the $8,425,000 cash down payment and $5,000,000 cash collateral deposit with GE were booked as unsecured loans from Hazelrigg companies known as Centurion Southwest, LLC and Centurion Pacific, LLC to CP3, which accrued interest at 15% and had to be paid in full from the company's proceeds, after servicing the GE loan, and before distributions to the members. The result was the same - a preferred return for Hazelrigg until his downpayment with interest (aka his unsecured loans) had been repaid. Aaron, Patrick McCourt and Barclay's North were also required to give GE a limited loan guaranty for $5 million, although CP3's operating agreement does provide for pro-rata reimbursement by the other members if they are forced to pay on the guaranty.

10. The final GE loan terms also ended up being different than I had been led to expect. Instead of a long term loan, GE only agreed to a 3-year bridge loan; although they orally informed me that if I was able to get extensions on the Facilities Leases for at least another five years each, GE would replace the bridge loan with longer term financing. Unfortunately, by the time I procured the extensions GE was no longer interested in providing a longer term loan, and the original loan matured November 30, 2009. When we were originally lining up the GE loan, I suggested we solicit

DECLARATION OF MICHAEL HENRY - 6

other lenders, but Hazelrigg instructed me he did not want to do so. Although my initial GE contact was Barbara Jabarra, Hazelrigg had developed a social relationship with Kyle Williams, who had been brought in by GE. Hazelrigg told me that he wanted to go strictly with GE and Kyle Williams and, accordingly, we had no backup plan when GE informed us of its decision to only provide a bridge loan.

## Additional Construction Funds and Shortfalls

11.    During the course of obtaining financing for the overall project, Battelle requested a major renovation (construction project) in one of the facilities. We procured a bid price of $3.366 million, and Battelle agreed it would pay that amount over time (aka "delta rent payments"), in addition to paying the regular rent and operating costs it was already paying under the Facilities Leases.   GE agreed to add the construction financing on top of the amount needed to purchase the Subject Property, which brought the total GE loan amount to $70.866 million GE conditioned the release of this construction loan, however, on my obtaining a lease supplement indicating that Battelle had agreed to pay the full cost of construction.   Accordingly, the GE loan closed in November 2006, but the $3.366 million portion of its loan was held back until January 2007 - when I provided GE with the executed supplement to the Facilities Leases.

12.    Prior to closing I had no reason to doubt my initial impression that Hazelrigg was a wealthy, successful businessman. I was, however, quickly disabused of that impression. Problems started with the construction financing and payments almost immediately. First, Battelle paid "delta-rent" of $515,000 as a down payment amount for CP3 to begin the construction. Hazelrigg demanded Sigma, as the management company, send him $500,000. This surprised me because the GE loan

DECLARATION OF MICHAEL HENRY - 7



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

documents <u>required</u> CP3 to use all Battelle's delta-rent payments to pay down the GE loan.  I told Hazelrigg I could not give him the money because it would cause CP3 to default on the GE loan. Hazelrigg was adamant: he wanted that money.  He told me he controlled the company, not me, and that I should not worry because he would send it back to me as needed.   Then, just a few days later (January 11, 2007) Hazelrigg demanded the <u>entire</u> $3.366 million which GE had loaned to CP3 to pay for the construction.  Again I told him this was wrong, violated the GE loan documents and we needed the money to fund construction.  Again, Hazelrigg reminded me that he controlled CP3, and assured me he would return the money to make construction progress payments as they came due so he forced me to send him $3.15 million of the $3.36 million received.   I was shocked by Hazelrigg's actions: both his looting a total of  approximately $3.65 million CP3 needed for construction and to pay back GE, and that he caused CP3 to immediately breach its GE loan covenants, which I perceived as endangering the company and its assets.

When I questioned Hazelrigg's actions, I pointed out Hazelrigg did not control CP3 since he was not an owner or the manager; it was his children and friend who owned 90% of the company. Hazelrigg responded that the listed owners of the 90% were just "figure heads" and that he was running everything.   Hazelrigg's son Aaron confirmed that Hazelrigg called the shots, not Aaron and not Aaron's company.   Moreover, Hazelrigg threatened to fire Sigma as the management company unless I gave him the money.  Accordingly, to protect the Sigma contract, and since I did not have the ability under the CP3 operating agreement to control CP3's actions, I reluctantly sent all the construction funds to Hazelrigg.

At first it seemed my concerns were unfounded, during the initial six months of construction Hazelrigg periodically gave back money for CP3 to make cover progress payments on the construction as they came due.  Unfortunately, it got increasingly harder to get Hazelrigg to pay back

DECLARATION OF MICHAEL HENRY - 8



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

the money.   With the balance of the project and three or four progress payments remaining, Hazelrigg stopped returning money all together. Hazelrigg told me he simply did not have any more money to send. Of course, I was very concerned because Hazelrigg had taken $3.96 million of CP3's money, but by then had only paid back approximately $2 million (i.e. $1.96 million less than he took).

I became quite worried about covering the balance of construction costs: CP3 did not have the funds to pay for completion of construction, Tom had taken the loan proceeds and, although Battelle was making their delta-rent payments CP3 was required to use the Battelle money to pay down the GE debt.  Thus, I was forced to loan CP3 money to complete construction, through my company Sigma and other sources.  We went forward, paid the construction costs on time and completed the project.

13.    About a year later, when I had successfully procured extensions of all five Facilities Leases, GE released $2.6 million of the $5 million (plus interest) cash collateral deposit Hazelrigg had paid over to GE at closing.  From the $2.6 million, Hazelrigg allowed Sigma to recover the approximately $500,000 shortfall in construction funds and then Hazelrigg ordered me to pay the remaining $2.1 million be paid into his personal bank account.  I objected to this arrangement for two reasons: (a) he still owed CP3 $1.15 million of the construction funds he had previously looted; and (b) I did not think it proper to pay funds directly to Hazelrigg in any event, since he was not to an owner of CP3.  Hazelrigg again was adamant and Aaron was no help.  Hazelrigg also assured me he would "take care of it" and again I reluctantly followed his demands and deposited $2.1 million into his personal account.

14.    By the end of 2007 and early into 2008, it was clear Hazelrigg was having financial difficulties.  He finally told me he had no money and that he could not repay the $2.1 million he had

DECLARATION OF MICHAEL HENRY - 9



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE, WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

taken or otherwise fund CP3's operational shortfalls.  Eventually, I was given the Hobson's choice of having CP3 fail with SMI losing its 10% ownership and Sigma lose its management contract, or using Sigma's funds to finance operations - which is I what I did.  There was no other choice, since Hazelrigg's looting emptied CP3's reserves and the GE loan documents prohibited subordinate secured debt.

## Alleged Transfers in Ownership of CP3

15.     From the beginning, Hazelrigg was the sole voice for the 90% CP3 owner, including Centurion - CP3's nominal manager.  I tried to contact his son Aaron, but Aaron always referred me to his father, and let his father make all decisions and respond to all inquiries.  In fact, as I later learned, in late 2007 Hazelrigg actually listed the Subject Property for sale - without ever informing me, even though my company was a 10% owner and I was the property manager's president.  When I learned of this matter, I asked Hazelrigg directly why he had not divulged such a major decision to me, Hazelrigg informed me that he had bought out all the other members, and he had controlling interest. I told him that was not possible, since CP3's operating agreement gave my company SMI a right of first refusal.  I also told him that, if true, his purchase triggered yet another a violation of the GE loan documents, as we were required to obtain GE's advance consent (in GE's sole discretion) prior to such a change in ownership.  Finally, I told him that, if true, his purchase of more than 50% of the ownership interest in CP3 triggered excise tax, which had to be paid by the sellers or by him. Assuming 1.78% excise tax rate, I estimate the excise tax he failed to pay exceeded $1.3 million. Hazelrigg derisively responded that he was not going to get GE's consent because the transfer was merely an internal situation, between family and friends, that he never paid excise tax and that anybody who did was "stupid," and he did not need to tell anyone what he was doing, that he was going to do what he wanted.

DECLARATION OF MICHAEL HENRY - 10

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

## False Representations on the Subject Property's Cash Flow

16.    In mid 2008 Hazelrigg again tried to sell the Subject Property. I again voiced my concerns that his actions were inappropriate, reminded him he had never produced evidence of a legitimate transfer of ownership, and that he had no authority to list the Subject Property. This time, there was a further problem: in the listing Hazelrigg overstated CP3's cash flow by approximately $300,000 to $400,000 annually. Hazelrigg justified this artificially high number by indicating he was including the property management fees paid to Sigma (which is paid by Battelle as part of its service rent). I repeatedly explained to him and his broker that this was wrong and needed to be corrected: management fees could not be included as cash flow, since Battelle was only reimbursing CP3 for actual expenses - and if CP3 did not pay management fees to a property manager, it could not collect them from Battelle.    Moreover, Battelle had negotiated a specific formula for management fees in its contract. Hazelrigg refused to correct the listing. He said he would include the management fees since whoever bought it could negotiate their own rate out of the gross cash flow. Again, I told Hazelrigg this was inappropriate because there was an existing contract in place with Battelle and his scheme would be, at best, deceptive to potential buyers.

Hazelrigg still refused to correct this deception.    He told me he could get property management services for much less than what Battelle paid for Sigma's work. I again explained the fault with his reasoning: Battelle only paid for the actual charges assessed for management services and that the Facilities Leases simply did not provide for CP3 to make a profit on management fees. At one point Hazelrigg said they could just do a "kick back deal" wherein they could present it to Battelle at "full freight:" the higher rate now charged by Sigma, and then he or the new owner could arrange to a substantial kick back of that fee, so the manager was only paid 1.5%. I told him that there were many problems with his scheme, besides being deceptive and illegal, the least being there



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

would not be enough money to operate the property management by a long shot. I pointed out that there was little profit build into the property management contract for Sigma as it stood and he would not find competent management who would do it for less; moreover I pointed out that industries studies reflect property management fees run between 3.5%-6% of gross rent depending upon services provided.

Although the extra cash flow might seem on the surface a small detail when the Subject Property was worth over $70 million, it actually has an exponential impact on a property's valuation because commercial properties are commonly valued by their "cap rate" - which reflects the rate of return on investment through cash flow.  Thus Hazelrigg's deception would artificially inflate the Subject Property's perceived value by millions of dollars - which is exactly what Hazelrigg told me was his intent in falsely stating cash flow. Hazelrigg again instructed me provide the fake cash flow numbers to the real estate broker, but I refused and we ended up at an impasse.  In mid 2009, someone again engaged a real estate broker to market the Subject Property using the fake cash flow numbers and when the broker called to verify the cash flow, I told him his numbers were wrong. This time I provided the broker with the true cash flow numbers. Hazelrigg and I ended up in another argument about this matter; it has never has never been resolved, although brokers do not seem to be calling.

Refinancing the Subject Property

17.    In early 2008, CP3's lawyer sent me a document to sign (the "Consent").  The Consent states Hazelrigg is the sole member and managing member of Centurion and authorized to represent the Company for any business purpose, including refinancing or financing loans encumbering Company property. Even though I received it in 2008, the Consent was backdated to January 1, 2007.

DECLARATION OF MICHAEL HENRY - 12



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

I called Hazelrigg when I received the Consent to sign, asking why he needed it and pointing out (again) that I still had not received anything showing he owned the 90% interest in CP3. Hazelrigg told me he needed the Consent because he was getting quite close to replacing the GE bridge loan with a new permanent loan from a different lender. I told him that before I signed it, I would like to see something to verify he actually had control of the 90% of CP3. He rebuffed my request and pressured me repeatedly to sign the Consent. I even tried unsuccessfully to get the transfer documents from CP3's lawyer, who responded "you don't want to know". Given this odd answer, I continued to delay signing the Consent. Eventually, however, Hazelrigg demanded I sign the Consent as written and backdated, or he would cancel Sigma's management contract. He reassured me he only needed the Consent because he had financing lined up to replace the GE bridge loan, and my delays were jeopardizing the entire refinance. This was at the same time the financial markets were in a tailspin, so his explanation seemed reasonable - get new financing put in place before the new lender backs out. Although I was not happy with signing the Consent without some documentation, I knew realized that under CP3's operating agreement, the company's manager Centurion could act without my approval regardless of who owned Centurion. I also knew that even with the Consent there were limits on what type of financing Hazelrigg could arrange, since both the CP3 operating agreement, the recorded GE deed of trust and the other GE loan documents prohibit CP3 from putting or allowing junior liens to be filed against the Subject Property.

18.    In May 2008, about two months after I signed the Consent, Hazelrigg called telling me he had a group called Equity Funding in his office. He said Equity Funding had his "nuts in a vice" and that he owed them a lot of money. Hazelrigg then told me he wanted to give Equity

DECLARATION OF MICHAEL HENRY - 13



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

Funding the Subject Property in lieu of the debts he owed them. I was in Seattle that day, so I met with Equity Funding in an attempt to figure out what was really going on, why it involved CP3 and how Hazelrigg's proposal would impact my company's 10% interest in CP3 and Sigma's property management contract.   Until that call, I had never heard of Equity Funding but thereafter learned that its principals Joe and Derek Edmonds (father and son), through their companies Equity Funding, LLC ("Equity Funding"), Centrum Financial Service ("CFS")  and Trident Investments, Inc. ("Trident") had been making deals with Hazelrigg for some time, placing in total five liens on the Subject Property - all in violation of the GE loan documents and CP3's operating agreement. They included the following:

> (1) a leasehold deed of trust signed by Aaron, for the benefit of CFS recorded on July 10, 2007, which purported to secure a loan from Centrum to CP3 for $10 million in principal made between February and July 2007, although CP3 never received any such loan, it is not in the Company's books, I have never seen any note or other loan documents except the recorded deed of trust, and both the GE loan documents and CP3's operating agreement prohibited such secured debt;

> (2) a leasehold deed of trust signed by Hazelrigg for the benefit of CFS recorded on March 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave on March 5, 2008 to benefit CFS - no amount is stated in this deed of trust, I have never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions;

> (3) a leasehold deed of trust signed by Hazelrigg for the benefit of Equity Funding recorded on April 7, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave to benefit Equity Funding - no amount is

DECLARATION OF MICHAEL HENRY - 14



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE, WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

stated in this deed of trust, I have never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions - this is the Deed of Trust which is the subject of the February 26, 2010 Trustee's Sale discussed below, and although the deed of trust refers to a guaranty, the notice of which refers to a promissory note for $3,346,000.

(4) a leasehold Deed of Trust signed by Hazelrigg for the benefit of Trident recorded on November 5, 2008 which purports to secure a continuing guaranty of an unstated dollar amount CP3 allegedly gave to benefit Trident - no amount is stated in this deed of trust, I have never seen any such guaranty and both the GE loan documents and CP3's operating agreement prohibited such actions;

(5) a Memorandum of Agreement signed only by Derek Edmonds, listing CP3 as grantor and Trident as grantee recorded November 6, 2008, and describing an underlying agreement whereby all "net sums" that would otherwise be paid to CP3 in connection with the sale of the Subject Property were to be paid by giving CP3 certain, undefined "notes receivable."    I have no knowledge of any such purchase and sale agreement and am unaware of any notes payable by CP3 to Trident.

19.    During my meeting with the Edmonds they told me they ran Equity Funding (since Equity Funding, CFS and Trident were all generically referred to as Equity Funding during discussions, so that is how I refer to them for the balance of this declaration).  The Edmonds told me Hazelrigg had borrowed a lot of money from them, but they did not say exactly how much.  They also told me that Hazelrigg had borrowed all of the money he contributed to CP3 for the purchase of the Subject Property and the $5 million cash collateral deposit.  I was shocked, and replied that Hazelrigg had always told me he was contributing his own funds.  I also told the Edmonds I did not

DECLARATION OF MICHAEL HENRY - 15

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

see how or why CP3's property should be turned over in lieu of Hazelrigg paying back his personal loans. The Edmonds then claimed that Hazelrigg had given Equity Funding a secondary deed of trust on the Subject Property as security for Hazelrigg's personal loans. I told them that was not possible because GE, the primary lender, did not allow secondary debt and would never have approved such a thing. The Edmonds then conceded that when they originally made loans to Hazelrigg, they were not secured by liens on the Subject Property, but were secured on deeds of trust on other of Hazelrigg's properties located in New Mexico. They disclosed that it was not until some time later that Hazelrigg granted the secondary deed of trust on CP3's property - to secure approximately $13.5 million in loans previously made to Hazelrigg. This was a surprising and shocking disclosure which caused me great concern - since neither the GE loan nor CP3's operating agreement allowed secondary liens.

20. Regardless of when Hazelrigg gave Equity Funding these liens, I told the Edmonds that GE never consented to the liens. Hazelrigg's response was that he did not need to comply with the requirements in the GE loan documents, he also said they (Equity and Hazelrigg) do this type of thing all of the time. I reiterated that (1) the loan documents are very clear in imposing an advance consent requirement, and (2) Hazelrigg did not notify me, as a member of CP3 that he was going to violate the GE loan documents and put secondary debt on the property.

21. Both during that meeting and later, Equity Funding kept pressing me to make a deal with them or they would foreclose. I was very concerned and felt we were obligated to tell GE, but Derek Edmonds responded that Equity Funding did not care. I then determined the best solution would be for me to pursue refinancing, to see if I could procure sufficient loan proceeds to pay off GE and remove the Equity Funding lien (at that time I was only aware of one Equity Funding lien). Meanwhile, Hazelrigg spun various tales, at one point telling me he had other properties and he

DECLARATION OF MICHAEL HENRY - 16

could move the Equity Funding debt onto; and another time telling me he had other ways of paying them off.  During this time he also revealed that at the time I signed the backdated Consent, there had not actually been any replacement financing lined up, because there just were not any loans out there to be had.

22.    In August 2009 GE notified me that CP3 had defaulted on its loan because, in part, there was secondary debt secured by the Subject Property.  GE provided me with a title report, which is when I first learned there were five different liens or other clouds on title in favor of Equity Funding.  The recorded documents did not specifically indicate how much was secured, although Derek Edmonds subsequently informed me the debt secured by those liens exceeds $55 million.

<u>More Ownership Claims</u>

23.    One of services Sigma provides as property manager for the Subject Property is to coordinate preparation of CP3's federal income tax return.  In March 2009 Sigma's accountant prepared CP3's 2008 federal tax return using the information Sigma and I provided.  In March 2009 I sent the completed return to Hazelrigg, to have his son sign on behalf of CP3's managing member. Hazelrigg did not do so.  Instead he called me and informed me that he wanted me to falsify the ownership structure shown on the 2008 tax return to reflect that during 2008 Dan Kirby owned 90%, and SMI 10%.  I told Hazelrigg I would not do that.  I did not know anything about a Dan Kirby; I never heard of a Dan Kirby; and I knew for a fact that Dan Kirby did not own 90% of this property throughout the 2008 tax year; so I refused to do it.  Hazelrigg responded that he would create a backdated sale agreement showing that Dan Kirby bought the 90% interest as of January 1, 2008. Hazelrigg told me he needed to make this change because he owed Dan Kirby a lot of money, I think the number was $8 million, and he wanted to give Dan Kirby the tax credit for his CP3 ownership interests, which would reduce Hazelrigg's over all debt to Dan Kirby.  I told him I would not be a

DECLARATION OF MICHAEL HENRY - 17

Leen & O'Sullivan,
PLLC
590 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

party to defrauding the federal government; therefore, I would send the tax return to him for execution and filing, as we had prepared it - and without listing Dan Kirby as an owner. I was determined not to participate in this deception, and accordingly filed a K-1 for CP3 with my tax return, appropriately filled out as I understood the ownership structure to be. In October, 2009 I received a K-1 from Randy Tanner of Hagen, Kurth, Perman and Co., P.S. which reflected Dan Kirby as the addressee for CP3. I never saw the executed and filed 2008 federal tax return for CP3.

Last week, my assistant received a telephone call from Randy Tanner, who indicated he is Dan Kirby's accountant, that Dan Kirby is the 90% owner of CP3 and he needs CP3's 2009 year-end financial reports to complete CP3's taxes and that Hazelrigg had prepaid Randy Tanner to expedite completion of the 2009 tax return. I also received an e-mail from Hazelrigg, instructing me to provide Dan Kirby's accountant with this information. I have not responded since I believe I would be facilitating a fraud on the I.R.S. to this date the only document I have seen indicating that Dan Kirby has some ownership interest in CP3 is the false K-1 Randy Tanner sent to me. To date I have not seen any of the documents necessary to transfer ownership to Dan Kirby, nor have I seen anything to indicate that the approximately $1.3 million in excise tax that would be due the state and county in connection with such a transfer was ever paid.

### Changing Managers & Ownership Percentages

24.    In September, 2009 GE notified me that CP3 was also in default because CP3 had been dissolved. I then discovered that CP3's manager Centurion (Aaron's company) had also been dissolved. This perplexed me, but upon investigation I learned both CP3 and Centurion had been dissolved because their registered agents had resigned in March, 2009 and the companies' managers failed to designate new registered agents within 90 days thereafter. I repeatedly tried to get the Hazelrigg and Aaron to reinstate the companies, but they failed to act. Since I did not have authority



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

to act for the CP3 I could not reinstate CP3 on my own.  Eventually, Hazelrigg and Aaron agreed to designate SMI as CP3's manager, so I could get the company reinstated.  I did this and also procured and prepared the documents to get Centurion reinstated.

25.    During this same time, I continued to search out replacement financing and remained concerned that Hazelrigg or Aaron might try and place more bogus liens against the Subject Property or take other impermissible actions.  It would be pointless to locate and front the due diligence fees to a prospective lender if we could not remove the numerous clouds on title Aaron, Hazelrigg and the Edmonds apparently imposed.  It became apparent I needed to confirm my company, SMI, would be the sole manager, that no major decision could be made without SMI's consent and that I would need to personally finance any attempt to refinance or extend the term of the GE loan.  Accordingly, in November, 2009 I asked Hazelrigg and Aaron to agree to increase my ownership to 25% (transferring it internally from Aaron to me), and amend CP3's operating agreement to require a vote of 76% of the membership for major decisions.  They finally agreed.  Since amendments to CP3's operating agreement can be made by a majority of the members, and since Hazelrigg had repeatedly informed me that the named owners (other than SMI) were mere figure heads and he actually owned those interests, I asked both Aaron (on behalf of Centurion) and Hazelrigg to sign and acknowledge the above described changes, confirm that Hazelrigg was <u>not</u> an owner, that Hazelrigg did <u>not</u> have any authority to act on behalf of CP3, and that the ownership of CP3 was now as follows:

Aaron Hazelrigg (through Centurion)  63%

Nicole Kelly  10%

Patrick McCourt  1%

DECLARATION OF MICHAEL HENRY - 19



Leen & O'Sullivan, PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

Barclay's North 1%

SMI Group XIV, LLC 25%

26.     The amendment to CP3's operating agreement, signed in November 2009 by both Hazelrigg and Aaron, confirmed that SMI Group XIV, LLC was CP3's sole manager and the only person with authority to sign on behalf of CP3 and that such designation could not be changed without the vote of the holders of at least 76% of the membership interest. Since then there has been no change in the manager, as I have not voted for a change in manager, and SMI Group XIV's vote is needed to make such a change.

Accordingly, I was quite surprised when, on February 1, 2010, Derek Edmonds e-mailed me a contract between CP3 and Equity Funding, dated January 29, 2010, which Hazelrigg purportedly signed as a member of Centurion (Aaron's company) and indicated that Hazelrigg, through Centurion, was signing the contract on behalf of CP3 - and that Centurion was CP3's manager. I had not approved that contract, which would waive all claims CP3 has against Equity Funding and allow Equity Funding to complete its foreclosure of the property. Interestingly, the agreement talks of allowing a local principal (which Derek Edmonds said was me) to take a membership interest in the new Property owner. Accordingly, what this latest agreement really attempts is a transfer of Hazelrigg's 75% interest in CP3 to Equity Funding in a manner which circumvents Hazelrigg's excise tax obligations of over $1 million, which would have been due the state and county had Hazelrigg directly transferred his membership interests to Equity Funding, or if CP3 gave Equity Funding a deed in lieu of foreclosure.

<u>Refinancing Efforts & Equity Funding's Claim</u>



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

27.     Once I was able to take control of CP3 I contacted GE and provided them with copies of the documents designating me as manager and reinstating the companies. They informed me that Derek Edmonds wanted to talk to them about restructuring the GE loan and asked if I would consent to such discussions. With no immediately viable option and the November 30, 2009 maturity date looming, I agreed to allow such discussions. At that time I thought Equity Funding was claiming lien rights of approximately $13 million, which I thought could be addressed in a replacement loan.

28.     I also contacted Derek Edmonds and asked what he would take to remove all the junior liens. He agreed to take a total of $10 million, indicating he could get the balance from other of Hazelrigg's properties. Although I did not think his liens were valid, $10 million was much closer to the unsecured "member loans" Hazelrigg's companies made to CP3 at the onset, so I decided that if CP3 paid $10 million to remove all the invalid liens and if it also cleared the initial unsecured "member loans" then paying Equity Funding was a reasonable solution. Buoyed by that agreement, I continued to work diligently and located a viable lender and negotiated a loan application. I also negotiated a month extension with GE on their loan and worked toward closing the replacement loan by the end of 2009. During that time Equity Funding had recorded a notice of trustee's sale for one of their liens against the Subject Property, setting February 26, 2010 as the foreclosure sale date. Since I knew they would accept $10 million to remove all their invalid liens I was not overly concerned.  I did, however, retract the agreement I had previously signed allowing Equity Funding to negotiate with GE.

29.     In the end we were not able to close the replacement financing by year end, and it seemed prudent to request a three month further loan extension from GE. Unfortunately, GE denied my request, citing their concern with the Equity Funding notice of trustee's sale. I was informed that it was incumbent that I get the notice withdrawn before they would discuss an extension.   I then

DECLARATION OF MICHAEL HENRY - 21



Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424

contacted Derek Edmonds, explaining that his notice had hobbled my efforts to obtain the replacement financing, and asking for his cooperation. Derek then informed me that he wanted $20 million to remove the liens, not $10 million as he had previously stated.    $20 million was extortionate, particularly in light of the bogus nature of Equity Funding's debt.

30.    Without a new extension or forbearance from GE, GE's loan has now matured and must be paid in full. GE posted and served its default notice on the Subject Property and CP3 on January 8, 2010.    This is the first step in GE foreclosing their deed of trust.    GE had already implemented a process whereby Battelle makes all rent and service rent payments into a bank lockbox account controlled solely by GE (a "hard lockbox"). GE then pays out the service rent to Sigma, upon proof of expenditures. Any balance after servicing their debt is kept by GE and added to CP3's cash collateral balance. CP3 does not receive any revenue. Since GE has declared the loan in default, however, the interest rate escalated to 12% and GE is applying all revenues to debt service (after paying actual operating costs).

31.    In the last several weeks both Derek Edmonds and Hazelrigg have approached me and asked me to consent to a deed in lieu of foreclosing on Equity Funding's deed of trust, promising me a substantially similar ownership interest in the new ownership entity. In addition to my concerns about acting as CP3's manager, I raised my concern over who would pay the approximately $1.34 million in excise tax. Again I was told I was being naïve, but they would also consider structuring it as an agreed upon judicial foreclosure. Again I raised a concern over excise tax and it was again dismissed.    Hazelrigg then ginned up a scheme for me to pay his designee (Eric DeGooyer) a monthly stipend of $10,000, plus a 20% interest in the proceeds of my ownership interest, in exchange for getting all of the CP3 members to consent to allow me to enter into an

Leen & O'Sullivan,
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1494

1    arrangement with Equity Funding and facilitate the purported "tax free" transfer of the Subject

2    Property to an Equity Funding company. I turned down that offer.

3

4

       SIGNED this 3rd day of February, 2010 at Kennewick, WA.

5

6

7                 MICHAEL HENRY

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   DECLARATION OF MICHAEL HENRY



Leen & O'Sullivan
PLLC
520 EAST DENNY WAY SEATTLE,
WASHINGTON 98122
(206) 325-6022
FAX (206) 325-1424